128 N.J. Super. 149 (1974)
319 A.2d 262
KATHLEEN M. PIETRUNTI, RESPONDENT-APPELLANT,
v.
BOARD OF EDUCATION OF BRICK TOWNSHIP, PETITIONER-APPELLEE.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 1974.
Decided April 23, 1974.
*151 Before Judges HALPERN, MATTHEWS and BISCHOFF.
*152 Mr. Emil Oxfeld argued the cause for appellant (Messrs. Rothbard, Harris & Oxfeld, attorneys).
Mr. Martin B. Anton argued the cause for appellee (Messrs. Anton and Ward, attorneys; Mr. Donald H. Ward, on the brief).
Mr. Gordon J. Golum, Deputy Attorney General argued the cause for the State Board of Education (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. George F. Kugler, Jr., former Attorney General of New Jersey, and Mr. Stephen Skillman, First Assistant Attorney General, of counsel).
Mr. Thomas P. Cook argued the cause for New Jersey School Boards Association and New Jersey Association of School Administrators, amici curiae (Messrs. Cook and Knipe, attorneys).
PER CURIAM.
This is an appeal from a decision of the Commissioner of Education, affirmed by the State Board of Education, dismissing appellant, a tenured teacher, from her employment with the Brick Township Board of Education, effective on the date of her suspension by the local board of education on September 8, 1971. Appellant also appealed from the determination of the State Board of Education which reversed the decision of the Commissioner granting her compensation at her regular salary retroactively to the date of her suspension, under the provisions of N.J.S.A. 18A:6-14, as amended by L. 1971, c. 435, § 2, effective February 10, 1972.
Appellant became a member of the faculty in the Brick Township School District as a business education teacher in the high school in 1966. Her career was uneventful until 1970, when she became a member of the grievance committee of the Brick Township Education Association. During that period she apparently had some difficulties in her relationships *153 with the superintendent of schools. Appellant became president of the Education Association in April of 1971. The record shows that as of that date the local board of education had been dilatory in obligations to bargain collectively with the association and had refused to meet with the association for a period of 83 days. Efforts were then ongoing to negotiate a new bargaining agreement since the current agreement expired on June 30, 1971. Negotiations subsequently resumed, however, and a new agreement was successfully negotiated prior to the opening of the new school term in September 1971.
During the latter part of August 1971 appellant was invited by the school district administration, as the president of the Brick Township Education Association, to be one of the speakers at an orientation meeting to be held on September 1, 1971. A speech was given, and that speech, as delivered, generated the principal charges made against appellant by the local board of education. The undisputed evidence discloses that appellant used the occasion of the orientation meeting to speak against the school administration in general and against the superintendent of schools in particular. Rather than insert excerpts from the speech throughout this opinion, we have attached hereto, as an appendix, the speech delivered in its entirety.
As a result of the speech appellant was charged in ten written charges with conduct unbecoming a teacher, insubordination and conduct subversive of the discipline and morale of the school system. Her references to the dismissal of two nontenured teachers (Charge 1), the suspension of a fellow teacher (Charge 2), the removal of three books from the English curriculum (Charge 4), the lack of black teachers, and the characterization of the superintendent of schools as a villain (Charge 5) were alleged by the local board as conduct unbecoming a teacher. Her reference to the dismissal of the two nontenured teachers (Charge 1) was alleged as an instance of insubordination to the office of superintendent of *154 schools. Her references to the suspension of the fellow teacher (Charge 2), the claimed involvement of the superintendent of schools in local politics (Charge 3), the removal of books and the dearth of black faculty (Charge 4), her description of the school system as a "snakepit for young teachers" (Charge 6), her suggestion to nontenured teachers to refrain from any criticism until they have tenure (Charge 7), and her description of the district's hiring practices as a "callous economic gesture" (Charge 8) were alleged as instances of conduct subversive of the discipline and morale of the school system.
As a result of these charges appellant was suspended from her teaching duties on September 7, 1971, effective September 8, 1971. On the same date she gave a public apology for her orientation meeting speech of September 1, distributing copies of the speech to all who were present to hear her apology. After her suspension ten additional charges were preferred. In these charges appellant's actions as a tenured teacher and president of the Brick Township Education Association were alleged to represent an attitude of insubordination which foments disrespect for the office of superintendent and usurpation of administrative functions. A directive claimed to have been issued by appellant to the faculty urging them to refuse to comply with an administrative request to file letters with respect to individual teacher's intentions for the succeeding year; her public expression of concern that administrative vacancies existed; her suggestion that the faculty file letters of intent in language suggested by her; her letter questioning the dismissal of a nontenured teacher, authorship of a bulletin regarding this teacher and a letter directed to parents of students on the subject; and an association directive dealing with teachers' duties, were all cited for bases for this charge. (Charge 9 was found by the hearing officer to constitute a legal summation rather than a charge, thus requiring no defense.) The release of a news bulletin calling for arbitration of the nonrenewal of the contracts of two nontenured teachers (Charge 11), the *155 purported misrepresentation of the presence of the president of the board of education at a meeting between the superintendent and association representatives (Charge 12), the purported misrepresentation of the cancellation of a meeting requested by the New Jersey Education Association with the administration (Charge 13), and the reference to the superintendent of schools as "Carmen" rather than "Stephen" (Charge 14), were alleged in support of claimed insubordinate and vindictive conduct subversive of the discipline and morale of the school system. A disagreement over the insufficiency of a lesson plan and a reply of "shove it" to an observation by the subject supervisor that she was late for class (Charge 15) were alleged as instances of insubordination, refusal to accept administrative authority and conduct unbecoming a teacher. The claimed insincere apology for the September 1 speech made on September 7, 1971 (Charge 16) and an alleged statement of purpose to rid the school system of the superintendent (Charge 17) were alleged as indicia of a philosophy incompatible with the school system. The uttering of various "unladylike and unfeminine" remarks in places of public accommodation, such as, "elementary teachers have elementary minds," "C. Serpent Raciti," (referring to the superintendent, C. Stephen Raciti), "This paper is so poor it is not good enough to wipe my ass," "You son-of-a bitch, you did that on purpose," "Ding Dong Bell," "bald headed mental midget" and "bald-headed bastard," the latter three statements referring to board president, William Bell, were alleged as subversive of the discipline and morale of the school district (Charge 18). A bulletin critical of another teacher which was claimed to have been "enforced and/or condoned" by appellant was alleged as subversive and unbecoming conduct (Charge 19). Finally, a remark to another teacher in the course of a reprimand was alleged as an instance of interference with supervisory duties. (Charge 20).
Hearings before a hearing officer designated by the Commissioner of Education began on January 17, 1972 and concluded *156 on April 12, 1972. There was no dispute in the testimony adduced over the fact that the language complained of in the first eight charges was uttered by appellant. The hearing officer determined the question of fact to be whether the statements uttered and complained of were true in fact, and whether the orientation meeting was the proper forum for these remarks.
The hearing officer filed a detailed report with the Commissioner. For the purposes of this opinion, we find it necessary to give a brief summary of his conclusions. As to Charge 1 he found that there was no basis for appellant's statement that the two teachers were "fired," although this may be the common understanding and the practical effect of the action of the board of education on persons who may not be versed in the technical ramifications of school law. As to Charge 2, he made no specific findings of fact with respect to the core of the charge per se, finding solely that the subject of the incident was inappropriately raised by appellant. In reaching this conclusion the hearing officer makes the suggestion that the local board of education may have been culpable itself in handling the subject matter which was referred to by appellant. Charge 3, which related to alleged local political activity by the superintendent, was left by the hearing officer to the Commissioner's judgment as to whether the minor instances of political encounter found to have been indulged in by the superintendent were such as to be deleterious to his role as educational leader. He also left for the determination of the Commissioner whether appellant's inclusion of such allegations represented conduct unbecoming to a teacher in the public schools.
The hearing officer saw fit to break Charge 4 down into three subcharges: the first, that appellant attempted to usurp the authority of the board when she charged that it arbitrarily yanked books from the English curriculum; the second, the innuendo raised by appellant that the administration had a racist hiring policy; and the third, that the superintendent violated confidences of the grievance procedure. *157 The first subcharge was found to be without merit, and the hearing officer found that no evidence was presented at the hearing which confirmed even an inferred premise of racial discrimination by the board. As to the third subcharge, the hearing officer left the determination as to whether the orientation day ceremony was a proper forum for its expression, suggesting also that the Commissioner determine whether the pertinent part of appellant's speech was factually based in truth or in her belief. The hearing officer concluded that the assumptions and inference drawn by the local board in Charge 5 were unwarranted and that it was unjustifiable to conclude that appellant's use of the word "villain" was to be given its full Shakespearian connotation. Charge 6 was sustained, leaving to the Commissioner the question of the propriety of the words used as a part of the speech. Charge 7, which dealt with advice to nontenured teachers, was found by the hearing officer not to require a finding of fact but a value judgment by the Commissioner. The hearing officer found little factual support for Charge 8, which charged the respondent with seriously interfering with the administration of the school system, pointing out that there was no concrete evidence of any kind that the orientation day speech ever served as an "interference" per se with the school administration, or that new teachers resigned their positions because of it.
The hearing officer also reviewed the additional charges served on appellant subsequent to her suspension. He found that the activities of appellant were in fact as alleged in Charge 10, but the effect on the school district was left to the judgment of the Commissioner. Charge 11 was withdrawn by the board. The hearing officer found that in fact the president of the local board was an intruder in a meeting between the superintendent and the association and, therefore, recommended a dismissal of Charge 12.
The claim that the superintendent of schools dozed in court during proceedings, and the reference to him in a letter as "Carmen" were found to be of such minor consequence *158 that they need not be considered by the Commissioner as substantial evidence against appellant. Charge 15, which related to her relations with her subject supervisor, were ordered dismissed by the award of an arbitrator after the hearings, and the hearing officer's report thereon. The fact of the arbitrator's award and its contents were forwarded to the State Board of Education before it reviewed the Commissioner's determination. Because of the award, the State Board eliminated Charge 15 from consideration of the charges against appellant. We have not considered this charge in our review.
Charge 16, which alleged that the apology for the orientation day speech was insincere, was recommended to be dismissed. The hearing officer found in Charge 17 that appellant probably did say words to the effect that the superintendent has "got to go" in private conversation with the assistant superintendent of schools. He recommended, however, that all other inferences and facets of this charge be dismissed. In Charge 18 the hearing officer properly made no finding that the words attributed to appellant were "unfeminine" or "unladylike." He did find that appellant used the expressions "son-of-a-bitch" and "bald headed mental midget." Charge 19, which related to criticism of a fellow teacher, was recommended as dismissed for want of real evidence. The final charge, which dealt with the interference with the performance of a teacher's duty, was found to be undisputed since the supervisor involved admitted he had no authority to direct the teacher involved to perform the task assigned. The hearing officer left any final conclusion with the Commissioner.
The Commissioner, for the greater part, accepted the hearing officer's report. He found that the evidence sustained several charges against appellant which were of a sufficiently serious nature so as to warrant her dismissal. With certain specific exceptions, which he noted in his decision, he sustained the charges of the local board relating to the orientation day speech. He also upheld, with certain exceptions, the *159 charge that the speech contained untruths and distortions, and found that it constituted a derogatory personal indictment of the superintendent of schools which had been presented in the wrong forum and was patently unfair to him.
Certain of the charges unrelated to the orientation day subject were also sustained by the Commissioner. In this group of charges he determined Charges 10A, 10C, and 18D to be the most serious. The first of these charged that appellant, as president of the Education Association, had directed tenured teachers not to sign letters of intent which sought information as to whether those teachers plan to return to the school district for the fall semester. Charge 10C was related to Charge 10A since it charged that the letter in question interfered with the administrative rights and duties of the superintendent of schools. In sustaining these two charges the Commissioner found that appellant was guilty of insubordination and that her action, if followed by a majority of the tenured teachers, could have crippled the effective operation of the school district. Charge 18D involved the incident in which appellant called another teacher a son-of-a-bitch in the presence of students. The Commissioner reviewed a claim of provocation and found this incident to be evidence of conduct unbecoming a teacher.
It was the Commissioner's conclusion that the orientation day speech, standing alone, warranted appellant's dismissal from the Brick Township School District. It was the Commissioner's opinion that the constitutional obligation of local boards of education to provide a thorough and sufficient system of public education could not be carried out in an atmosphere of turmoil and conflict between school officials and employees. He stated:
When such an atmosphere clearly exists, as herein, and when the atmosphere was created by a teacher acting in a premeditated and calculated manner (the speech, p-1) the Commissioner believes that the tenure rights of the teacher are forfeit to the needs of the district as a whole for a cooperative effort in the education of children. It is this effort of local boards of education, the representatives of the *160 people through the electoral process, and of school administrators, entrusted by the boards with duties of school management, which, in the Commissioner's judgment, must be supported.
The Commissioner determined that the appellant should be dismissed from her employment with the Brick Township School System, effective on her date of suspension by the Board of Education on September 8, 1971.
Following the Commissioner's determination an appeal was filed with the State Board of Education and on April 4, 1973 that body affirmed the Commissioner's decision dismissing appellant. The decision of the State Board of Education also reversed that portion of the Commissioner's decision which granted appellant full pay retroactive to the 121st day after her suspension, as noted above.
Before discussing the substantive matters before us on this appeal, a procedural point must be dealt with. Appellant claims that the Commissioner violated provisions of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., by not affording the parties an opportunity to object to the report of the hearing officer before he issued his decision. See N.J.S.A. 52:14B-10(c). Unquestionably, the failure to provide this opportunity was erroneous and not in accordance with the provisions of the Administrative Procedure Act. Winston v. So. Plainfield Bd. Ed., 125 N.J. Super. 131, 138 (App. Div. 1973). The right to object to a hearing officer's report made by one for the use of another who was entrusted with final decision making, who must rely in part, at least, upon that report, has long been embedded in our jurisprudence. See Mazza v. Cavicchia, 15 N.J. 498, 523-524 (1954). We have recently held in Winston, above, that this axiom of administrative due process is applicable before the Commissioner of Education. In answering this argument the Attorney General informs us that after our decision in Winston was handed down, he advised appellant, through counsel, that his office would be agreeable to a remand of these proceedings to the Commissioner for the purposes of *161 allowing the parties to file exceptions to the hearing officer's report. This offer was declined by counsel for appellant. The Attorney General now contends that the refusal constitutes a waiver of the objection to the procedure employed by the Commissioner in this case. Under the circumstances existing, i.e., the lengthy hearings and the period of time elapsing between the filing of charges and the action of the State Board of Education, we see no point in becoming involved in a procedural predicament. We have elected to consider the arguments raised by appellant and the other parties on appeal as objections to the hearing officer's report, and have undertaken to review the entire record and that report in light of the arguments raised. We adopt this procedure in this case because of the public nature of the question involved and the desire of all parties to bring an early termination to these proceedings. We trust that in the future the Commissioner will observe the provisions of N.J.S.A. 52:14B-1 et seq.
It is our conclusion that the fact of delivery of the orientation day speech by appellant, considering its content, was sufficient in itself to warrant her dismissal from employment by the school district of Brick Township. And while we affirm the decision of the State Board of Education insofar as it affirmed the allegations of the Commissioner, we find that the sustaining of the additional charges by the Commissioner and the State Board serve to strengthen the basic conclusion that appellant's irresponsible conduct on September 1, 1971 rendered her unfit to continue as a faculty member of the Brick Township School System.
Throughout appellant's arguments for reversal two basic misconceptions exist. The first, that the local board of education could not prove that any action by her had any significant effect on the school system in that not a single teacher gave up teaching as a result of any action taken by her, not a single person was induced not to apply for a teaching position in the system as a result of any action taken by her, and not a single student was in any way influenced by *162 any action taken by her. The second is that the conduct complained of must be considered in the context of a struggle by her seeking adjustment of the conduct of "Boards of Education, Superintendents of Schools and other administrative personnel" to the role which the collective bargaining agents of their teachers have by law been authorized and obligated to assume. We believe both of these basic assumptions exhibit a misconception of the role of a teacher in a school district and the role of a teacher as a negotiator for collective bargaining rights for school district employees. In any event, the issue before us is the conduct of appellant as an individual employee of the Brick Township School District.
Appellant's first main argument is that the Commissioner overlooked the relationship between Brick Township Board of Education and the Brick Township Education Association of which appellant was president prior to the orientation day exercises. She contends that the speech which she delivered at those exercises was nothing more than a "culmination of frustration and provocation caused by the failure of the Board and Superintendent to live up to their legal responsibilities." Examples of this failure are said to be demonstrated by the administration permitting 83 days to elapse without any attempts at collective bargaining with the Education Association. Assuming, for the sake of argument, that these allegations are true, and we observe that the evidence does point to a certain amount of truculence to negotiate on the part of the board, we cannot conclude that the situation gave the right to appellant to resort to abusive rhetoric contained in the orientation day speech. We cannot conceive of any legitimate excuse for such unprofessional conduct. Appellant's attempt to cloud the issue by urging that she was legally bound as president of the association to represent its "rank and file" vigorously and with good faith is a non sequitur. Labor negotiations are not the subject matter of these proceedings.
The fact that appellant was the president of the education association did not give her leave or power to resort *163 to the remarks which she did. Puentes v. Bd. of Education of Union Free School District No. 21 of Town of Bethpage, 24 N.Y. 2d 996, 302 N.Y.S.2d 824, 826, 250 N.E.2d 232, 233, motion for reargument dismissed 25 N.Y.2d 930, 305 N.Y.S.2d 148, 252 N.E.2d 628 (Ct. App. 1969).
Indeed, it should be fairly apparent that efficient leadership would eschew a public attack such as that contained in the complained of speech. If in fact the administration of the school district improperly conducted its relationships with the teachers' association in the area of collective bargaining, that fact in itself cannot be held to justify improper conduct by the teachers or their representatives. A civilized society expects one who believes himself wronged to resort to legal channels in seeking redress, and not to resort to trial by battle. It is in this connection that we should also observe that the question of the truth or falsity of the claims made in the speech by appellant are not in reality the issue before us; rather, we are concerned with the timing and the reckless, intemperate nature of the deliverance.
One final observation should be made with respect to the orientation speech and the charges arising out of it. The hearing examiner found that Charge 16 was unproven and, therefore, required no defense. That charge related to the apology purportedly made by appellant on September 7, 1971 for her orientation speech. The board charged that the apology was insincere, basing its claim on subsequent remarks of appellant, as well as the fact that she caused copies of the speech to be distributed at the time her apology was delivered. While the Commissioner never explicitly indicated that he accepted the recommendation of the hearing officer that Charge 16 be dismissed, we deem this to be irrelevant in review of our conclusion that the speech as composed should never have been delivered at the orientation meeting or in public at any other time. It is our opinion that any apology under the circumstances could not have served to rectify the situation created solely by appellant by her exercise of poor judgment in making the speech in the first place.
*164 Appellant's next argument is that she never usurped any essential function of the board of education. This argument relates to the matters described in Charges 10A and 10C. It will be recalled that the superintendent of schools had circulated a questionnaire to the tenured faculty seeking to learn their individual intentions with respect to returning to employment in the ensuing year. Appellant sent a notice to those faculty members urging them not to comply with the superintendent's request because the faculty should not do anything that would make the board's job any easier. The Commissioner found this act of appellant's to have been potentially disruptive of the school district. Appellant now argues in effect that it was beyond the power of the Commissioner to sustain these charges since the superintendent is nowhere given "legal warrant" for the action which he took in soliciting information with respect to teacher return. It is argued that there is no specific statutory authority for this sort of procedure. The argument is clearly frivolous. As a matter of common sense and prudence, a superintendent would take such action to find out just how many teachers he would have in the coming year and how many new teachers he would have to seek to fill vacancies that will be created. The authority to circulate such a questionnaire is implicit in the duties of the office of superintendent. On the other hand, appellant had absolutely no right as an individual teacher, or as a self-styled labor leader, to adopt the obstructionist attitude that she did in encouraging the faculty not to respond. We agree with the Commissioner that her irresponsible act was potentially dangerous to the entire school district. That nothing came of her attempts is irrelevant; although we find it significant that the faculty evidenced their maturity by ignoring appellant's suggestion.
Appellant also contends that the Commissioner, by his determinations, invalidly thrusts upon her a duty and burden for which there is no basis in law. This argument arises out of the Commissioner's conclusion in which he states:
*165 * * * The proofs herein provide little reason to believe that respondent has, in the past, or could in the future, be seriously interested in aiding the Brick Township Board to provide the "thorough and efficient" school system required by Constitutional prescription.
This conclusion is questioned principally because, it is argued, the Commissioner gives no authority, either statutory or case law, for this requirement. It is claimed that the Commissioner has concocted some kind of duty which is new and novel and which would raise grave constitutional questions if upheld. We see no constitutional difficulty with the Commissioner's conclusion, which, incidentally, appellant argues out of context. The answer is pure and simple: a teacher is something more than a classroom automation. A teacher is a professional who has by education and training obviously dedicated himself or herself to the education of youth. A teacher is expected to exhibit loyalty to the district in which he or she is employed and to cooperate with the administration in seeking the educational goal. Appellant would relegate a teacher to a "rank and file" member of an organization who seeks some communal goal of self-aggrandizement. It is the individuality each teacher brings to the educational scheme that contributes to educational success; that individuality, however, must be sublimated to the educational goal. A teacher is expected to show a reasonable respect for the authority of his or her employer and to maintain a civility commensurate with his or her professional status. All of this we find to be implicit in the Commissioner's quoted conclusion. Appellant's resort to billingsgate, and other questionable conduct found by the Commissioner, tends to show that she has failed to meet even the minimum professional standards expected of her. We do not suggest that any teacher may not legally or constitutionally believe that a board of education or a superintendent of schools is not carrying out their functions properly, and may not speak out publicly with respect to such belief, or resort to political activities to defeat the members of such a board of education. These are rights which need *166 not be emphasized since they are inherent in our democratic process. Indeed, the failure to exercise such rights, on proper occasion, might well constitute unprofessional conduct. What we do suggest is that the exercise of these rights be accomplished professionally.
Appellant's final argument dealing with the Commissioner's findings is that they deprive her of her constitutional rights and liberties. The argument is premised on the observation that "it is commonplace that teachers do not forfeit their constitutional rights merely because they are teachers." We agree. But we observe at the outset of this discussion that neither the constitutional right of a teacher to speak freely on public issues nor the statutory right of school employees to bargain collectively for their own welfare will override the basic obligation of an employee to the employer. Free speech and collective bargaining rights do not endow a teacher, as a school district employee, with a license to vilify superiors publicly. The employer-employee relationship restrains the right of the employee to the extent reasonably necessary to retain that harmony and loyalty which is necessary to the efficient and successful operation of the educational system. Breen v. Larson College, 137 Conn. 152, 75 A.2d 39 (Sup. Ct. Err. 1950); cf. Marchitto v. Central R. Co. of N.J., 9 N.J. 456 (1952).
In advancing her constitutional argument appellant relies chiefly on Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In Pickering the teacher had written a letter to the editor of a local newspaper criticizing the manner in which his board of education and superintendent of schools had handled past proposals to raise new revenue from the public for defendant school system. Essentially, the letter complained that too much money was being sought for the athletic program, and not enough money for teachers' salaries. The letter also charged the superintendent of schools with attempting to prevent teachers in the district from imposing or criticizing the proposed bond issue. The teacher also charged that the board of education *167 was "trying to push tax supported athletics down our throats," and that certain actions of the superintendent created a climate of "totalitarianism" in which teachers lived at the high school.
The Supreme Court held that the letter did not justify the teacher's dismissal, and that its contents and publication were protected by the First Amendment. The court observed:
At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.
In concluding that the balance there rested on the side of the teacher, the court noted, among other things, that the issues discussed in the letter were matters of public importance and concern, and that the public interest in having free debate on such matters permitted the teacher to make statements thereon  even if false  so long as the false statements were not made knowingly or recklessly (see New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)), or the matters were so within the teacher's presumed knowledge of school affairs that his statements would produce a harmful impact on the public. In reaching its determination the court also made another significant observation:
The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among co-workers is presented here. [391 U.S. at 569-570, 88 S.Ct. at 1735]
Pickering is clearly distinguishable from the instant controversy. There the letter confined itself to public issues and did not contain insulting and vituperative language, or an *168 attack on the character of superiors. Unquestionably, as we have noted before, appellant had the right to speak out publicly on such matters of public interest as the policy of the board of education with respect to textbooks, the hiring practices with respect to black teachers and the lack of due process accorded to nontenured teachers. We find, however, that appellant chose to ignore those issues as a matter of public concern and distorted them into a vehicle to bring scorn and abuse on the school administration in general and the superintendent of schools in particular. In doing so she forfeited her claim to First Amendment protection. See Duke v. North Texas State University, 469 F.2d 829 (5 Cir.1972), cert. den. 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973).
We also reject appellant's argument that our affirmance of the determination of the Commissioner and the decision of the State Board of Education with respect to the charges made against her will serve to "chill" the association rights of teachers as well as the rights of teachers freely to speak and assemble. An aggressive, contentious and, perhaps, controversial teacher working within the structure of a school district as a faculty member and/or as an education association representative may confidently look to the First Amendment as a protective shield for his or her activities; however, an intemperate, venomous employee, be he or she a teacher or otherwise, cannot claim constitutional protection when he or she attacks his or her superiors in public in brawling terms for no purpose discernable other than to satisfy some personal need.
Our review of the entire record satisfies us that the findings of fact made by the hearing officer and adopted by the Commissioner of Education are supported by substantial evidence. We also find that the conclusion drawn by the Commissioner, based on the record and the hearing officer's report find substantial support in that record.
Appellant was suspended from her employment effective on September 8, 1971. On February 10, 1972, L. 1971, c. 435, *169 § 2, became effective. That statute, now embodied in N.J.S.A. 18A:6-14, provides that if the determination of charges pending against any employee of a board of education is not made by the Commissioner within 120 calendar days after certification of the charges, then such person shall be paid beginning on the 121st day until such determination is made.
The Commissioner determined that N.J.S.A. 18A:6-14, as amended, applied retroactively and ordered that appellant be paid her full salary from the 121st day following her suspension until the date of his determination. The State Board of Education reversed in a five to four vote, concluding that the statute should not be given retroactive effect. We agree that the Commissioner's determination was correct and reverse the finding of the State Board in this respect. See the recent opinion of this court in In re Tenure Hearing of Grossman, 127 N.J. Super. 13 (App. Div. 1974).
We affirm the decision of the State Board of Education, filed April 4, 1973, insofar as it affirms the decision of the Commissioner of Education of July 19, 1972, dismissing appellant from her employment with the Brick Township school system. The decision of the State Board, insofar as it reverses the decision of the Commissioner to grant appellant compensation at her regular salary pursuant to the provisions of N.J.S.A. 18A:6-14, as amended, and directing that appellant be paid at her full salary, in accordance with the statute, by the Brick Township Board of Education from a date commencing 121 days after her suspension until July 19, 1972, the date of the decision of the Commissioner of Education, is reversed.

*170 APPENDIX

EXHIBIT "A"

PRESIDENT'S ADDRESS

ORIENTATION NEW STAFF

September 1, 1971
On behalf of the Brick Township Education Association I welcome you to the Brick Township School District. I look forward to your membership into the BTEA  for today more than ever we need the collective and organized strength of teachers in facing the many challenges here in Brick Township and indeed in the state of New Jersey.
At this point, I would like to divert for a moment to invite all of you to be guests of the BTEA Executive Board at a cocktail party  planned specifically for you  at the KNIGHTS OF COLUMBUS BUILDING ... tomorrow ... between 3 and 6 p.m. Our president-elect, Jim McCabe, will distribute directions at the end of this session. Please ... attend.
As you are undoubtedly aware, we have had serious problems here in Brick this past year. Fortunately some have been resolved, regrettably others have not.
OUR PROLONGED and often bitter contract negotiations with the Brick Township Board of Education have resulted in a contract settlement. It is a contract governing many of your terms and conditions of employment. Within the coming weeks we shall have copies available for you. It is our full intention that the contract be fully honored by Board and administration alike.
OUR PROGRESS as they relate to the negotiations of a contract have been resolved  at least until contract negotiations re-open 18 months from now  a word now about our resolved problems.
*171 THE RECORD clearly shows that this Association has no faith in the school's administration  more specifically no faith in the superintendent of schools.
FORGIVE ME if the forum of the traditional Orientation Day would appear NOT to lend itself to a discussion of these matters. But what must be said will be said.
WHY DOES THIS Association not have faith in the Superintendent of Schools? Let me tell you a few stories.
1. Last year two fine young teachers with excellent records were recommended for rehiring by their principals and their supervisors. They were dynamic, well-liked, personable and extremely competent men. Without warning, without explanation, this man fired them. The lower courts have said that his action was legal but there is a higher court that would term the action despicable  the court of justice, reason and compassion.
2. ANOTHER STORY  earlier last year an English teacher made a speech at Atlantic City criticizing what has throughout the State become known as the "BRICK BOOK BURNING"; as a result this teacher was subjected to some of the most inhuman treatment ever perpetrated by a Board of Education, resulting in her suspension and the first strike in New Jersey on the issue of Academic Freedom. Through it all, the man that just spoke to you remained conspicuously silent.
3. I WANT TO TELL YOU another story  a third story. There were two elections in Brick Township last year  one for Mayor and one for the Board of Education. Despite all good sense and good reason, this man became intimately embroiled in these political campaigns  destroying whatever distance and objectivity he might have been able to maintain as the so-called chief teacher in the district.
4. ANOTHER STORY  the year before last three books were arbitrarily yanked from the English curriculum  arbitrarily by the Board of Education. Books, incidentally, all written from the black point of view. This man not only remained silent throughout the controversary [sic], he admits *172 that the blame is his alone. In passing, perhaps you might ask him someday how many black teachers have been hired to work in Brick Township, and if they applied would they be seriously considered.
I could tell you stories about this man violating the confidence of the Grievance Procedure. I could tell you a story about him digging into a man's past to threaten his professional life  I could go on and on with story after story but I think you get the point. The man who just spoke to you fits Hamlet's description of his uncle ... that he does smile and smile and smile and yet remain a villain.
BRICK TOWNSHIP is a snakepit for young teachers and and I would just give you one bit of advice  for the next three years dig a professional hole and hide under it  don't budge, don't move, say "yes sir" to everyone and wait and watch and remember that in New Jersey there are very good tenure laws ... your time will come. And our only defense has been and ever will be a strong professional association and I can only urge everyone of you to please, for your sake and for ours, become members of the united teaching profession. There are more teachers than there are superintendents.
THE RECORD SHOWS that we will fight for the teachers, but until there is more enlightened courts, our fighting will affect no fire. We can't win ... yet we will go to the ends of the world for you but probably fall off the edge for you because you can't be saved ... SO HIDE.
IF YOU HAVE BEEN reading the paper or attending Board meetings you know that I have been fighting against you  some of you  those of you not fully certificated ... but you are here now, you are brand new teachers  most of you  and you are not aware that you have become economic pawns. From my own personal experience, it takes a year or two to find yourself in this business. Two or three brand new teachers in a district can be absorbed ... but not 70 or 80% of them, some of whom are not properly certificated. *173 This hiring practice is eating at the core of the principle of certification, and I term this whole procedure a callous economic gesture.
BUT NOW YOU ARE HERE  we're behind you ... we will support you, but we want you to know our position. WE'RE BEING HONEST. We believe now that you are here you will blend in with the rest of the staff. We'll SUPPORT YOU ALL THE WAY 
THE BETA WILL PROVIDE for the involvement of teachers in educational policy, will provide for due process for its non-tenured teachers, will promote the welfare and provide for the protection of all its members, Carmen Raciti not withstanding.
PLEASE JOIN WITH US IN THAT ENDEAVOR. Thank you.

(Emphasis appellant's)