706 A.2d 706

JAMES KARINS, APPELLANT–RESPONDENT, v. CITY OF ATLANTIC CITY, RESPONDENT–APPELLANT.

Argued October 20, 1997—Decided February 18, 1998.

*Karen M. Williams* argued the cause for appellant (*Jasinkski and Paranac*, attorneys; *Ms. Williams* and *David F. Jasinski*, on the brief).

*Jeffrey S. McClain* argued the cause for respondent (*Jacobs & Barbone*, attorneys; *Michael J. Pender*, on the brief).

The opinion of the Court was delivered by

COLEMAN, J.

The issue raised in this appeal is whether the First Amendment prevents a municipality from disciplining an off-duty firefighter for directing a racial epithet at an on-duty police officer. While James Karins, an off-duty firefighter employed by the City of Atlantic City ("City"), was being interviewed by a City police officer during a drunk driving traffic stop, he uttered a racial epithet when an African–American policeman arrived as a back-up officer. Karins was charged by the City Fire Department (A.C.F.D.) with violating department rules and regulations. The Personnel Director of the City, after conducting a hearing, found that Karins had violated specified rules and regulations and suspended him for 48 working days without pay. The Merit System Board reversed and the Appellate Division affirmed.

We reverse and hold that (1) the racial epithet uttered by Karins is not protected by the First Amendment in this disciplinary context, (2) the rules and regulations he was found to have violated are not unconstitutionally vague or overbroad, and (3) he was properly disciplined.

## I

On August 16, 1993, City police officers Andy Pronovost, who is white, and Mark Rassmann, who is African–American, were patrolling Gardner's Basin, the site of the City's annual "Harborfest" celebration. At approximately 12:15 a.m., Pronovost observed Karins drive his automobile into the Gardner's Basin area and stop to speak with a parking attendant. Pronovost spoke with the same parking attendant who informed him that Karins appeared to be intoxicated. Pronovost then followed Karins's car for a short distance and made a routine traffic stop.

As Pronovost approached the car, Karins and two female passengers exited the vehicle. Karins immediately identified himself as a firefighter with the A.C.F.D. During Pronovost's interview with Karins, he observed that Karins staggered, slurred his speech, and smelled of alcohol. Despite those observations, Pronovost in the exercise of his discretion, decided he would not subject Karins to any of the standard sobriety tests. Pronovost cautioned Karins and his companions about the dangers of driving while intoxicated. During the lecture, Karins responded with belligerence and sarcasm.

Rassmann observed those events and approached the scene to provide backup assistance. Rassmann greeted Pronovost with either "Hey Pronovost" or "Hey Bro." Karins then turned to Rassmann and stated "Oh no, don't start that nigger shit!" and walked away.

After the outburst, Pronovost informed Rassmann that Karins was a City firefighter. Rassmann then approached Karins and requested his name and identification. When Karins attempted to discuss the racial epithet, Rassmann told him that they would discuss it when Karins was not drinking. Although upset and angered that another City employee would use a racial epithet while speaking to him, Rassmann had no intention of including the racial epithet in his official incident report because he wanted to handle the matter "man-to-man" at a later time. Karins was not arrested or charged with any offense that night.

Within a few days of the incident, both Pronovost and Rassmann were asked by their superior officers to supplement their reports to include the incident. On September 1, 1993, Karins was served with a Preliminary Notice of Disciplinary Action, charging him with the following misconduct:

1. Conduct Unbecoming a Public Employee; [contrary to *N.J.A.C.* 4A:2–2.3(a)(6) ];

2. Conduct Unbecoming an Atlantic City Firefighter:
 Not conducting oneself in the customary rules of good behavior observed by law abiding and self respecting citizens, in or out of uniform; [contrary to *A.C.F.D.* Art. VII, § 2–A(a) ];

3. Conduct Unbecoming an Atlantic City Firefighter:

[A firefighter shall not] violate any law, or do anything for which they may be arrested; [contrary to *A.C.F.D.* Art. VII, § 2–A(c) ];

4. Conduct Unbecoming an Atlantic City Firefighter:

Repeated violation of the A.C.F.D. rules and regulations or any other course of conduct indicating that a member has little or no regard for his responsibility as a member of the A.C.F.D.; [contrary to *A.C.F.D.* Art. VII, § 2–A(*l*) ];

5. *A.C.F.D.* Operational Procedure # 105—Policy Against Discrimination, Harassment and Hostile Environments in the Workplace:

It is against Department policy to engage in verbal or physical conduct or otherwise to engage in conduct directed at an individual employee or class of employees which any reasonable person would conclude:

\* has the purpose or effect of creating an intimidating, hostile, or offensive working environment;

\* has the purpose or effect of unreasonably interfering with an individual's work performance; or

\* otherwise adversely affects an individual's employment.

The repeat offender charge against Karins was based on the fact that he had previously received a ten-day suspension for racial epithets directed toward a fellow firefighter. The prior incident occurred in September 1992 when Karins was disciplined for calling an African–American firefighter a "coon." For that incident, the Chief of the A.C.F.D. found Karins guilty of violating *A.C.F.D.* § 2–C(b): "Using profane or insulting language to a superior, subordinate or any other A.C.F.D. member."

Karins's conduct in that case contributed to the City's need to promulgate Operational Procedure # 105, which was the basis of Karins's fifth charge in the present matter. Operational Procedure # 105 was issued in May 1993, and Karins received a copy of the procedure in June 1993.

A disciplinary hearing was conducted by the Personnel Director for the City, and she found Karins guilty on all five charges. Karins was suspended without pay for 48 days. Karins requested and received a *de novo* review that was conducted before the Office of Administrative Law. The Administrative Law Judge who heard the case recommended that: (1) Karins's suspension be rescinded; (2) Karins's back pay, benefits and seniority for the period of suspension be reinstated; and (3) Karins be awarded

reasonable attorney's fees and costs. Without addressing the constitutional issues, the ALJ concluded that the City was impermissibly attempting to discipline Karins for a violation of an unwritten speech code of which he did not have adequate notice. The ALJ concluded that the City failed to sustain its burden of proof on all the charges, and that Operational Procedure # 105 applied solely to employees in the workplace during working hours.

The Merit System Board adopted the factual findings and legal conclusions of the ALJ. The Appellate Division affirmed in an unpublished opinion, holding that there was "nothing unreasonable, arbitrary, or capricious about the agency's decision." We granted certification, 147 *N.J.* 580, 688 *A.*2d 1055 (1997), and now reverse.

## II

The City asserts that the Appellate Division erred because it did not resolve the constitutional issues presented by the City's application of *N.J.A.C.* 4A:2–2.3(a)(6) and the A.C.F.D. rules and operational procedures to Karins's racial slur. The City argues that the court should have applied the balancing test enunciated in *Pickering v. Board of Educ.*, 391 *U.S.* 563, 88 *S.Ct.* 1731, 20 *L.Ed.*2d 811 (1968), and applied by the New Jersey courts in *Pietrunti v. Board of Educ.*, 128 *N.J.Super.* 149, 319 *A.*2d 262 (App.Div.), *certif. denied*, 65 *N.J.* 573, 325 *A.*2d 707, *cert. denied*, 419 *U.S.* 1057, 95 *S.Ct.* 640, 42 *L.Ed.*2d 654 (1974). The City maintains that under the *Pickering* test, the racial epithet was a matter of private concern and was therefore unprotected speech. The City contends further that under the *Pickering* test, its interests in maintaining a working relationship between the police and fire departments, the morale within the departments, and the public's perception and acceptance of its public servants far outweigh any interest that Karins may have in using a racial slur.

Karins agrees that the Appellate Division was presented with the constitutional issues but chose not to address them. He

maintains, however, that the issues were not properly before the Appellate Division because they exceeded the scope of the ALJ's decision. Karins maintains that if the Court considers the merits of the constitutional claims, his conduct-related speech was protected under the *Pickering* test.

It is well established that the judicial capacity to review administrative agency decisions is limited. *Public Serv. Elec. and Gas Co. v. New Jersey Dep't. of Envtl. Protection,* 101 *N.J.* 95, 103, 501 A.2d 125 (1985) (citing *Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm'n,* 93 *N.J.* 384, 390, 461 A.2d 575 (1983)). In reviewing the Merit System Board's decision, the Court should not disturb the agency's ruling unless it finds that the Board's action was arbitrary, capricious or unreasonable. *In re Warren,* 117 *N.J.* 295, 296, 566 A.2d 534 (1989). Under the arbitrary and capricious standard, the scope of judicial review is restricted to four inquiries:

(1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*George Harms Constr. Co. v. New Jersey Turnpike Auth.,* 137 *N.J.* 8, 27, 644 A.2d 76 (1994) (citations omitted).]

The City argues that in this disciplinary case Karins's utterance is not protected under either the Federal or State Constitution, and therefore the decision of the Merit System Board was arbitrary and capricious.

The traditional standard appellate courts follow when reviewing administrative agency determinations with respect to constitutional issues cannot be applied to all the issues raised in this case. The ALJ declined to address the constitutional issues, deciding instead to leave those issues to "constitutional judges." Neither the Merit System Board nor the Appellate Division addressed those issues. We have two options: either exercise original jurisdiction and decide the issues or remand them to the Appellate Division. Because of the public interest in an expeditious disposi-

tion of the significant issues raised, we have decided to exercise original jurisdiction pursuant to *Rule* 2:10–5 and decide whether the racial utterance was constitutionally protected free speech for which discipline may not be imposed. If it was not, then the Merit System Board's decision dismissing the charges was arbitrary and capricious.

### III

The City argues that there was no constitutional impediment to disciplining Karins pursuant to its regulations and *N.J.A.C.* 4A:2–2.3(a)(6) for his private racial epithet made while off-duty. Karins maintains that the regulations are void for vagueness, overbreadth, or both, and that disciplining him for off-duty private speech infringed upon his First Amendment right to freedom of speech.

First, we address Karins's vagueness and overbreadth arguments. The ALJ concluded that Karins had no notice that his speech was subject to discipline because (1) the "fashions of behavior" are subject to change and differing interpretations, and (2) the City's speech code is unwritten, and therefore incapable of providing notice.

A statute or regulation is facially unconstitutional for vagueness if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322, 328 (1926); *State v. Lashinsky*, 81 *N.J.* 1, 17–18, 404 *A.2d* 1121 (1979). Last term, we observed that a vague statute or regulation "creates a denial of due process because of a failure to provide notice and warning to an individual that his or her conduct could subject that individual to criminal or quasi-criminal prosecution." *State v. Hoffman*, 149 *N.J.* 564, 581, 695 *A.2d* 236 (1997).

Because this case involves alleged vagueness in the First Amendment context, the same standard of strict scrutiny that is

used for criminal prosecutions is to be applied. *Smith v. Goguen,* 415 *U.S.* 566, 573, 94 *S.Ct.* 1242, 1247, 39 *L.Ed.*2d 605, 612 (1974). Otherwise, a slightly less critical scrutiny would be permitted in this non-criminal case. *State v. Cameron,* 100 *N.J.* 586, 592, 498 *A.*2d 1217 (1985); *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 119 n. 16, 462 *A.*2d 573 (1983). Even applying the higher standard does not mean "that the rule or regulation cannot be drawn in broad terms, provided it is controlled by a sufficient basic norm or standard. It need not be minutely detailed to cover every possible situation." *In re Gioglio,* 104 *N.J.Super.* 88, 100, 248 *A.*2d 570 (Cty.Ct.1968) (citing *Moyant v. Borough of Paramus,* 30 *N.J.* 528, 553, 154 *A.*2d 9 (1959); *Ward v. Scott,* 11 *N.J.* 117, 123–24, 93 *A.*2d 385 (1952)).

-A-

 The existence of a "catchall" provision in a disciplinary regulation does not automatically render the regulation void on vagueness grounds. When confronted with a vagueness challenge to an employment regulation, the United States Supreme Court stated that "it is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees include 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'" *Arnett v. Kennedy,* 416 *U.S.* 134, 161, 94 *S.Ct.* 1633, 1648, 40 *L.Ed.*2d 15, 37 (1974) (quoting *Meehan v. Macy,* 392 *F.*2d 822, 835 (D.C.Cir.1968)). The *Arnett* catchall provision permitted removal or suspension of nonprobationary government employees "only for such cause as will promote the efficiency of the service." *Arnett, supra,* 416 *U.S.* at 140, 94 *S.Ct.* at 1637, 40 *L.Ed.*2d at 25.

*Arnett* involved a federal employee who was dismissed for publicly stating that his supervisor and an assistant attempted to bribe a representative of a community organization. *Id.* at 137, 94 *S.Ct.* at 1636, 40 *L.Ed.*2d at 23–24. The Court noted that the statute was "not directed at speech as such, but at employee

behavior, including speech, which is detrimental to the efficiency of the employing agency." *Id.* at 162, 94 *S.Ct.* at 1648, 40 *L.Ed.*2d at 38. The Court held that the statute was not unconstitutionally overbroad because the language, "such cause as will promote the efficiency of the service," excluded constitutionally protected speech. *Ibid.*

The District Court of Delaware, in *Aiello v. City of Wilmington,* 426 *F.Supp.* 1272 (D.Del.1976), applied the *Arnett* Court's rationale to two fire department regulations that were analogous to those at issue in this case. The pertinent provisions there provided that every member of the fire department was ordered:

To refrain from conduct unbecoming a fireman and a gentleman whether on or off duty.

\* \* \*

Be governed by the customary rules of good behavior observed by law-abiding and self-respecting citizens. Regardless of the time or place, whether in uniform or not, members shall conduct themselves in a manner that will not bring discredit to themselves or to the Department.

[*Id.* at 1276.]

The court concluded that although the regulations "may not be models of precision, [they] belong to a genre not unknown in the realm of public employment, particularly with reference to the uniformed services." *Id.* at 1292–93. The court rejected the vagueness argument, finding that the fireman's conduct of becoming intoxicated and breaking into a retail establishment while off-duty fell "within the narrow category of acts so egregious that, despite any protestations to the contrary, he could have had no doubt that they were proscribed." *Id.* at 1293. Similarly, the court rejected the overbreadth challenge because "facial invalidation by application of the overbreadth doctrine is inappropriate if the provision in question applies to a 'substantial number of situations to which it might be validly applied.'" *Id.* at 1294 (quoting *Parker v. Levy,* 417 *U.S.* 733, 760, 94 *S.Ct.* 2547, 2563, 41 *L.Ed.*2d 439, 460 (1974)).

The same reasoning applies to the present case. The A.C.F.D. regulations contain specifically enumerated offenses as well as

catch all provisions. It would be impossible for the A.C.F.D. to predict every instance of proscribed conduct. Constitutionally protected conduct-related speech is impliedly excluded from the regulations. Furthermore, Karins knew that the use of racial slurs was prohibited because he had been disciplined less than a year earlier for making such remarks. Indeed, Operational Procedure # 105 was promulgated because of his prior conduct, and he received a copy of it less than two months before the present incident. Four of the five charges against him were based on the use of the racial slur. The only exception was the charge for engaging in conduct that either violated a law or that could have led to his arrest. Hence, we reject the vagueness argument.

-B-

■ Whereas the vagueness doctrine "involves procedural due process considerations of fair notice and adequate warning," the overbreadth doctrine "involves substantive due process considerations concerning excessive governmental intrusion into protected areas." *Petition of Soto,* 236 *N.J.Super.* 303, 324, 565 *A.*2d 1088 (App.Div.1989), *certif. denied,* 121 *N.J.* 608, 583 *A.*2d 310, *cert. denied,* 496 *U.S.* 937, 110 *S.Ct.* 3216, 110 *L.Ed.*2d 664 (1990). "The standard is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far in fulfilling the state's interest." *Ibid.*

Generally, courts have allowed the government more leeway in regulating conduct-related speech rather than prohibiting speech itself. *See Arnett, supra,* 416 *U.S.* at 162, 94 *S.Ct.* at 1648, 40 *L.Ed.*2d at 38; *Broadrick v. Oklahoma,* 413 *U.S.* 601, 615, 93 *S.Ct.* 2908, 2918, 37 *L.Ed.*2d 830, 842 (1973); *Janusaitis v. Middlebury Volunteer Fire Dep't,* 607 *F.*2d 17 (2d Cir.1979). In *Janusaitis* the Second Circuit held that a volunteer fire department's bylaw prohibiting "unbecoming conduct detrimental to the welfare or good name of the Department" was not unconstitutionally overbroad. *Id.* at 28. The court reasoned:

The By-law does not make freedom of expression its substantial target nor is there any satisfactory way of severing the By-law's constitutional from its unconstitutional applications. There is no formula by which the non-protected area for governmental employees set forth in *Pickering v. Board of Education* or in *Meehan v. Macy,* can be defined with specificity. Since the By-law in question involves conduct rather than speech its "overbreadth" must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

[*Ibid.* (citing *Broadrick, supra,* 413 *U.S.* at 615, 93 *S.Ct.* at 2918, 37 *L.Ed.*2d at 842).]

As part of his vagueness and overbreadth argument, the fireman contended that he was dismissed because of an "unwritten rule ... 'whereby members are prohibited from making public statements expressing opinions about the Department without prior approval within the Department.'" *Id.* at 27. Rejecting that argument, the court noted that although there was a theoretical discussion of the unwritten rule during testimony, it was not stated as the specific ground for the fireman's dismissal. *Ibid.* "In any event, it was apparently understood by all as a gloss on the meaning of the [bylaw]" rather than a distinct basis for the disciplinary charge. *Ibid.*

We find a similar set of circumstances present in this case. Although the ALJ concluded that Karins was disciplined pursuant to an unwritten speech code, it was never established that such a code existed; nor was it cited as the basis for Karin's suspension. The catch all phrase "unbecoming conduct" was a "gloss" on the regulations rather than an additional ground for discipline.

The court in *Janusaitis* found to be significant the fact that the disciplined firefighter had received a specific prior warning from the fire chief that his conduct of sending complaints about the department to outside agencies was against department regulations. *Id.* at 27. Similarly, Karins received prior notice that racially discriminatory comments could subject him to discipline after he was suspended the first time in 1992 for calling a fellow firefighter a "coon." We reemphasize the fact that Operational Procedure # 105 was promulgated based on Karins's 1992 conduct. Therefore, Karins's argument that he was not provided adequate notice that such conduct was proscribed is unfounded.

 We must construe a regulation to render it constitutional if the regulation is reasonably susceptible to such a construction. *State v. Mortimer*, 135 *N.J.* 517, 533–534, 641 *A.2d* 257, *cert. denied*, 513 *U.S.* 970, 115 *S.Ct.* 440, 130 *L.Ed.*2d 351 (1994); *State v. Afanador*, 134 *N.J.* 162, 170, 631 *A.2d* 946 (1993); *State v. Ramseur*, 106 *N.J.* 123, 200, 524 *A.2d* 188 (1987). In accordance with that duty, we find that the regulations under which Karins was disciplined are not void for vagueness or overbreadth. Those regulations are clearly aimed at conduct rather than speech. The express language of *N.J.A.C.* 4A:2–2.3(a)(6) and *A.C.F.D.* Art. VII, § 2–A refers to "conduct unbecoming." The regulations are not overbroad because constitutionally protected conduct, including speech, is implicitly excluded from that proscription.

The catch all prohibition of conduct unbecoming a firefighter is not isolated, but rather rounds out a lengthy list of more specific provisions pertaining to proscribed categories of conduct. The A.C.F.D. regulations included a list of specific infractions that could constitute conduct unbecoming an Atlantic City firefighter such as gambling on duty, engaging in assaultive behavior, accepting or soliciting bribes or gratuities, publicly criticizing a superior, committing any criminal offense, or soliciting money for any cause without prior approval. Art. VII, § 2A.

Moreover, it would be impossible and impracticable for the A.C.F.D. to delineate every possible scenario that might subject a firefighter to disciplinary charges. We approve of the proposition stated by the Missouri Supreme Court, that "in the regulation of a vast metropolitan police department the necessities of discipline, morale and public confidence should permit the establishment of a broad range of proscribed conduct, without detailing every possible offense, and thus without the precision required in criminal statutes and procedure." *Milani v. Miller*, 515 *S.W.*2d 412, 417 (Mo.1974).

The Merit System Board's decision with respect to the constitutional issues of vagueness and overbreadth rests on the misapplication of constitutional principles and, therefore, is arbitrary and

capricious. The regulations under which Karins was disciplined are not unconstitutional based on principles of vagueness and overbreadth.

## IV

Next, we address Karins's claim that disciplining him for off-duty private speech infringes upon his freedom of speech. The ALJ concluded that the City could not constitutionally discipline Karins for the violation of an unwritten speech code. The Merit System Board adopted those findings and legal conclusions. Those legal conclusions implicate the freedom of speech of public employees.

The protections of the Free Speech Clause of the First Amendment extend to all citizens. *U.S. Const.* amend. I. The First Amendment has been made applicable to the states by the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 *U.S.* 296, 303, 60 *S.Ct.* 900, 903, 84 *L.Ed.* 1213, 1218 (1940). We rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution, art. I, ¶ 6. *Horizon Health Ctr. v. Felicissimo*, 263 *N.J.Super.* 200, 214, 622 *A.*2d 891 (App.Div.1993), *modified and aff'd*, 135 *N.J.* 126, 638 *A.*2d 1260 (1994); Robert F. Williams, *The New Jersey State Constitution* 34 (1990). But cf. *Sisler v. Gannett Co., Inc.*, 104 *N.J.* 256, 271, 516 *A.*2d 1083 (1986) (stating that in defamation cases, the New Jersey Constitution "has supported broader free speech rights than its federal counterpart").

Although the First Amendment was designed to assure that debate on matters of public importance is uninhibited, and wide open, *Roth v. United States*, 354 *U.S.* 476, 484, 77 *S.Ct.* 1304, 1308, 1 *L.Ed.*2d 1498, 1506 (1957), that amendment's guarantees have never been absolute. Many exceptions to the free speech guarantee have been carved out. In each of the exceptions, the right of free expression must be balanced against some competing governmental interest. The exception pertinent to the present case involves the balancing of public employees' freedom of expression

against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

"Firemen, like policemen and teachers, are not relegated to a watered-down version of constitutional rights." *Hasenstab v. Board of Fire & Police Comm'rs,* 71 *Ill.App.*3d 244, 27 *Ill.Dec.* 524, 527, 389 *N.E.*2d 588, 591 (1979). Some governmental agencies, however, have a stronger interest in regulating the conduct-related speech of their employees than non-governmental employers, particularly when such speech may disrupt governmental operations. *Connick v. Myers,* 461 *U.S.* 138, 140, 103 *S.Ct.* 1684, 1686, 75 *L.Ed.*2d 708, 715 (1983); *Pickering v. Board of Education, supra,* 391 *U.S.* at 568, 88 *S.Ct.* at 1734, 20 *L.Ed.*2d at 817; *see also Meehan v. Macy, supra,* 392 *F.*2d at 833. Hence, the *Pickering* standard has evolved for determining when conduct-related speech in public-sector employment is constitutionally protected.

In *Pickering,* the Supreme Court considered whether a public school teacher could be disciplined for writing a letter to the editor of a local newspaper, in which the teacher criticized the board of education and the superintendent of schools for failing to raise adequate new revenue for the schools. *Pickering, supra,* 391 *U.S.* at 566–67, 88 *S.Ct.* at 1733–34, 20 *L.Ed.*2d at 815–16. Recognizing that teachers do not automatically relinquish their First Amendment rights based on public employment, the Court held that it is necessary "to arrive at a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 *S.Ct.* at 1734–35, 20 *L.Ed.*2d at 817.

The Court in *Pickering* acknowledged that the "core value of the Free Speech Clause of the First Amendment [is the] public interest in having free and unhindered debate on matters of public importance." In formulating a test for determining when conduct-related speech in public employment is not protected, the Court stated that if "the fact of employment is only tangentially and

insubstantially involved in the subject matter of the [employee's communication], it is necessary to regard the [employee] as the member of the general public he seeks to be." *Id.* at 573, 574, 88 *S.Ct.* at 1737, 1738, 20 *L.Ed.*2d at 820, 820–21. Recognizing that the letter authored by the teacher did not impede the proper performance of his daily duties in the classroom, the Court concluded that the school administration's interest "in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 572–573, 88 *S.Ct.* at 1737, 20 *L.Ed.*2d at 819–820. Hence, the Court held that under a proper balancing test the teacher could not be suspended for submitting the letter to the local newspaper because the State's interest in controlling the contribution of the teacher was not significantly greater than controlling the general public. *Id.* at 574–75, 88 *S.Ct.* at 1738, 20 *L.Ed.*2d at 821.

The threshold question in applying the *Pickering* balancing test is whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick, supra,* 461 *U.S.* at 146, 103 *S.Ct.* at 1690, 75 *L.Ed.*2d at 719. The Court in *Connick* considered whether an assistant district attorney could be discharged for circulating a questionnaire to fellow staff members concerning internal office affairs. *Id.* at 140, 103 *S.Ct.* at 1686, 75 *L.Ed.*2d at 715. Relying on *Pickering,* the Court observed that "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 *S.Ct.* at 1690, 75 *L.Ed.*2d at 719.

Once the public interest prong of the *Pickering* standard has been satisfied, then a court must balance the employee's interest in free speech against the "government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 150, 103 *S.Ct.* at 1691–92, 75 *L.Ed.*2d at 722. That standard was

adopted because an employer should not be forced "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* at 152, 103 *S.Ct.* at 1691–92, 75 *L.Ed.*2d at 723. The Court in *Connick* found that the attorney's questionnaire touched on matters of public concern in the most limited sense, and concluded that the government employer properly discharged the attorney because it was reasonably foreseeable that her actions could disrupt the office, undermine authority, and destroy working relationships. *Id.* at 154, 103 *S.Ct.* at 1694, 75 *L.Ed.*2d at 724–25.

Thus, a two-part balancing test has evolved from *Pickering* and *Connick.* First, can the employee's speech be fairly characterized as relating to a matter of public concern? This is known as the employee's interest prong because it focuses on the interest of an employee, as a citizen, in commenting upon matters of public concern. Second, is there a governmental interest, as an employer, in the effective and efficient fulfillment of its responsibilities to the public through its employees? This is known as the public's interest or the governmental interest prong.

To summarize, when private expression is involved, the *Pickering/Connick* balancing test looks not only to the content of the speech, but also the "manner, time, and place in which it is delivered." *Ibid.; Givhan v. Western Line Consol. Sch. Dist.,* 439 *U.S.* 410, 415 n. 4, 99 *S.Ct.* 693, 696 n. 4, 58 *L.Ed.*2d 619, 624 n. 4 (1979). The *Pickering/Connick* balancing test "comes into play only when a public employee's speech implicates the government's interests as an employer." *Connick, supra,* 461 *U.S.* at 157, 103 *S.Ct.* at 1695, 75 *L.Ed.*2d at 726 (Brennan, J., dissenting).

Courts in this State have applied the *Pickering/Connick* standard a number of times. The Appellate Division, in *Pietrunti, supra,* 128 *N.J.Super.* 149, 319 *A.*2d 262, applied the *Pickering* test to determine whether a school teacher could be discharged for making a speech attacking her supervisors at an orientation session. The court stated:

> [W]e observe at the outset of this discussion that neither the constitutional right of a teacher to speak freely on public issues nor the statutory right of school employees to bargain collectively for their own welfare will override the basic obligation of an employee to the employer.... The employer-employee relationship restrains the right of the employee to the extent reasonably necessary to retain that harmony and loyalty which is necessary to the efficient and successful operation of the educational system.
>
> [*Id.* at 166, 319 *A*.2d 262.]

The court concluded that the teacher could not claim constitutional protection for attacking her superiors publicly. *Id.* at 168, 319 *A*.2d 262.

Likewise in *Hall v. Mayor & Dir. of Pub. Safety*, 176 *N.J.Super.* 229, 422 *A*.2d 797 (1980), the Appellate Division applied the same balancing test to determine whether a police officer could be suspended for making statements to a local newspaper criticizing his superior. The court stated that

> certain legitimate state interests may limit a public employee's First Amendment right of speech. Some of these interests are: (1) the need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to limit conduct which impedes the public employee's proper and competent performance of his duties, and (4) the need to encourage close and personal relationships between employees and their superiors.
>
> [*Id.* at 232, 422 *A*.2d 797.]

Although the court found that the regulation under which the police officer was disciplined was overbroad, the court held that the statement made by the police officer was beyond constitutional protection because it served to create disharmony, thereby impeding the proper functioning of the department. *Id.* at 233, 422 *A*.2d 797.

In the present case, the racial epithet expressed by Karins was directed at Rassmann, a fellow public employee. The slur was made by Karins, after he identified himself as a fireman, to a person whom he knew to be performing his official duties as an Atlantic City policeman. The racial slur was not remotely related to any matter of public concern. Consequently, the first prong of the *Pickering/Connick* standard has not been satisfied. Under the second prong of the *Pickering/Connick* test, the City's interest in maintaining order, discipline, harmony, and a professional work-

ing relationship between the police and the fire departments substantially outweighs Karins's right to make abusive, insulting, racially motivated comments. Lives are at stake when those departments are not cooperating and working effectively and efficiently. Karins's statements exacerbated racial tensions within the departments, and also within the community in general. Such statements have a tendency to disrupt morale and good working relationships.

Firefighters are not only entrusted with the duty to fight fires; they must also be able to work with the general public and other municipal employees, especially police officers, because the police department responds to every emergency fire call. Any conduct jeopardizing an excellent working relationship places at risk the citizens of the municipality as well as the men and women of those departments who place their lives on the line on a daily basis. An almost symbiotic relationship exists between the fire and police departments at a fire. Each department depends on the other to provide protection for the safety of all City employees and members of the general public present at the scene of the emergency. There are countless ways that bigotry in a fire department can endanger lives: delayed response time, less than careful assessment of risk, less than whole-hearted rescue attempts, and dissemination of inaccurate or incomplete information about a fire. Thus, a municipality has a significant interest in the off-duty conduct of its firefighters because it has a compelling interest in avoiding the consequences of strained relationships within and between the departments.

We hold that the racial epithet uttered by Karins while off duty is not constitutionally protected.

## V

Now that we have concluded that the regulations under which Karins was charged are not unconstitutionally vague or overly broad, and that the racial epithet uttered by him is not protected speech under the First Amendment or art. I, ¶ 6 of the New

Jersey Constitution, we must decide whether the charges against him have been sustained by a preponderance of the evidence. The ALJ's and the Merit System Board's erroneous legal conclusions caused them to conclude that the charges had not been established. The Appellate Division did not reject those erroneous legal conclusions; it found that the Merit System Board's decision was not arbitrary, capricious or unreasonable. We are compelled to make a *de novo* assessment of those charges because the agency's decision was based on a consideration of inappropriate factors. *In re Warren, supra,* 117 *N.J.* at 297, 566 *A.*2d 534; *State v. Bender,* 80 *N.J.* 84, 93, 402 *A.*2d 217 (1979).

The first charge was that Karins engaged in conduct unbecoming a public employee, contrary to *N.J.A.C.* 4A:2–2.3(a)(6). The determination of what constitutes conduct unbecoming a public employee is primarily a question of law. *Jones v. City of Pittsburgh,* 505 *Pa.* 25, 476 *A.*2d 895, 898 (1984).

The second charge of conduct unbecoming a City firefighter is part-and-parcel of the first charge and they must be read together. The first charge was based on a state regulation; the second was based on a City regulation. Under the Civil Service Act, rules may be adopted to carry out the Civil Service objective and to effectively implement a comprehensive personnel management system. *N.J.S.A.* 11A:2–6(d). The state regulation, providing that a state employee may be subject to discipline for conduct unbecoming a public employee, *N.J.A.C.* 4A:2–2.3(a)(6), was promulgated pursuant to the Civil Service statute. The second charge was based on Article VII, § 2–A(a) of the A.C.F.D. rules and regulations that provides that "[n]ot conducting oneself in [the] customary rules of good behavior observed by other law abiding citizens, in and out of uniform," constitutes conduct unbecoming a City firefighter.

Conduct unbecoming a firefighter or other public employee, in many ways, is reminiscent of the common-law offense of misconduct in office and the statutory offense of official misconduct, *N.J.S.A.* 2C:30–2. The contours of the common-law offense were

not always perfectly clear. *State v. Hinds*, 143 *N.J.* 540, 544, 674 *A.*2d 161 (1996). Before the common-law offense was abolished in 1979 by the Code of Criminal Justice, courts brought clarity to the offense by requiring as an element of the offense that the alleged conduct "involved and touched" the public employment of the accused. *Id.* at 546, 674 *A.*2d 161. Whether the offense was committed off-duty or during the working hours was not relevant. *Ibid.; State v. Bullock*, 136 *N.J.* 149, 153–55, 642 *A.*2d 397 (1994); *State v. Johnson*, 127 *N.J.* 458, 462–63, 606 *A.*2d 315 (1992); *Ward v. Keenan*, 3 *N.J.* 298, 309–11, 70 *A.*2d 77 (1949). Unlike the criminal charges of misconduct in office or official misconduct, the present disciplinary case based on conduct unbecoming a public employee in the First Amendment context does not require the contours of those charges to be defined with the same level of precision as that required for criminal offenses when the *Pickering/Connick* standard has not been satisfied.

New Jersey courts have applied the standard of "conduct unbecoming" in numerous cases involving the discipline of police officers. For instance, in *In re Emmons*, 63 *N.J.Super.* 136, 164 *A.*2d 184 (1960), the Appellate Division confronted the issue whether an off-duty police officer's refusal to cooperate and to submit to a sobriety test following an automobile accident constituted "conduct unbecoming an officer." *Id.* at 140, 164 *A.*2d 184. The court observed that "[t]he phrase is an elastic one," that "has been defined as 'any conduct which adversely affects the morale or efficiency of the bureau ... [or] which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services.'" *Ibid.* (quoting *In re Zeber*, 398 *Pa.* 35, 156 *A.*2d 821, 825 (1959)).

The standard adopted in *Emmons* was enunciated by the Supreme Court of Pennsylvania in a case in which a Pittsburgh firefighter was charged with "unbecoming official or personal conduct" after he was arrested and indicted for indecent assault, adultery, and contributing to the delinquency of a minor. *Zeber, supra,* 156 *A.*2d at 823. Following his acquittal, the fireman's

request for reinstatement was denied. *Ibid.* Noting the different burdens of proof at a criminal proceeding and a disciplinary hearing, the Pennsylvania Supreme Court emphasized that in determining whether "[u]nbecoming conduct on .the part of a municipal employee, especially a policeman or fireman," supports disciplinary action, "[i]t is sufficient that the complained of conduct and its attending circumstances be such as to offend publicly accepted standards of decency." *Id.* at 825.

More recently, the Appellate Division reiterated the elasticity of the phrase "conduct unbecoming an officer," in a case in which two off-duty police officers were disciplined for becoming inebriated and engaging in a fistfight and wrestling match. *Hartmann v. Police Dep't of Ridgewood,* 258 *N.J.Super.* 32, 39–40, 609 *A.*2d 61 (App.Div.1992). There, the court noted that a finding of misconduct need not "be predicated upon the violation of any particular rule or regulation, but may be based merely upon the violation of the implicit standard of good behavior which devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct." *Id.* at 40, 609 *A.*2d 61 (citing *City of Asbury Park v. Department of Civil Serv.,* 17 *N.J.* 419, 429, 111 *A.*2d 625 (1955)).

Similarly, administrative agencies have imposed discipline based on unbecoming conduct that involves offensive comments or slurs that do not satisfy the *Pickering/Connick* exception. Such conduct-related speech is treated the same as other unbecoming conduct cases. *See City of Newark v. Massey,* 93 *N.J.Super.* 317, 225 *A.*2d 723 (App.Div.1967) (finding police officer guilty of conduct unbecoming for exhibiting disrespectful and contemptuous attitude to superior officer); *Tress v. Burlington County Dep't of Health,* 93 *N.J.A.R.*2d (Vol.2A) 698(CSV), 1993 WL 470952 (concluding that religious slur "stinking liar and a Jew" stated by Department of Health worker to co-worker amounted to conduct unbecoming); *Nance v. City of Newark Police Dep't.,* 92 *N.J.A.R.*2d (Vol.2) 577(CSV), 1992 WL 276529 (suspending police

officer for cursing at fellow officer who was in the process of issuing him a citation).

In *Finn v. Burlington County Jail*, 95 *N.J.A.R.*2d 302(CSV), 1995 WL 271463, a corrections officer challenged his sixty-day suspension for "unbecoming conduct" after the officer was involved in a minor traffic accident and behaved belligerently toward two police officers at the scene. The corrections officer directed abusive, loud language toward the police, such as "those fucking police" and "bastards!" *Id.* at 305. Based on his conduct and his "greater duty than the average citizen" to demonstrate a level of respect to the investigating officers, the presiding ALJ affirmed the officer's suspension, and that decision was adopted by the Merit System Board. *Id.* 308–09.

Likewise, in *Rinnier v. Department of Transp.*, 94 *N.J.A.R.*2d (Vol.2B) 440(CSV), 1994 WL 183662, a Department of Transportation ("DOT") employee was disciplined for loud and belligerent remarks directed at a police officer. In *Rinnier, supra,* several DOT employees in a DOT repair truck howled at a woman being transported in a marked police car. *Ibid.* The police sergeant driving the car proceeded to stop the truck and request identification, but the workers refused. *Ibid.* The ALJ presiding over the disciplined employee's appeal reasoned that "[i]f these individuals were not public employees, this conduct would simply have been unwise and would likely have resulted in their arrest.... Nevertheless, the conduct was highly disrespectful to a police officer and clearly reflects poorly on the agency." *Id.* at 441. In the final agency decision, the Merit System Board affirmed the suspension. *Ibid.*

Here, Karins did not simply use a racial epithet against a private citizen, but against a police officer who was in the course of performing his duties. To make matters worse, he identified himself as an A.C.F.D. employee prior to conducting himself in such a manner. He exhibited this behavior in public, toward other City employees, and without regard to who may have witnessed the incident. Such conduct adversely affects the morale of both

the police and fire departments. It also has the tendency to destroy public respect for City employees and public confidence in the operation of the respective departments. Such behavior clearly offends accepted standards of decency. We find that by a preponderance of the evidence Karins's conduct constituted "conduct unbecoming" both a public employee and an A.C.F.D. member, in violation of *N.J.A.C.* 4A:2–2.3(a)(6) and Article VII, § 2–A(a) of the A.C.F.D. rules and regulations. The two charges, however, are merged for dispositional purposes.

## VI

Karins was also charged with committing "[r]epeated violation of the A.C.F.D. rules and regulations or any other course of conduct indicating that a member has little or no regard for his responsibility as a member of the A.C.F.D." Article VII, § 2–A(*l*). The ALJ reached the legal conclusion that Karins's sole responsibility as a member of the A.C.F.D. was to fight fires. Thus, the ALJ held that because this duty was not neglected and because he found no repeat violation in this case, there was insufficient evidence to support the charge. We disagree with the legal conclusions upon which the ultimate decision was based.

The ALJ failed to consider the seriousness of the charges against Karins given the context of his employment setting and the necessity of the fire and police departments to rely upon one another. Not only must firefighters fight fires, but they must also display a certain level of discipline and an ability to work well within the community. In light of those observations, Karins's disruptive behavior indicated that he had little or no regard for his responsibility as a City firefighter. The repeat offender provision in the regulation does not require the second violation to be identical to the first, although Karins's prior disciplinary sanction was for uttering a racial epithet. We find that Karins's conduct constitutes a repeat violation of department rules and regulations. Thus, we conclude that Karins violated *A.C.F.D.* Article VII, § 2–A(*l*).

## VII

Karins was also charged with engaging in conduct that violated the law or could have subjected him to an arrest. The ALJ concluded that there was insufficient evidence to prove that Karins had committed any offense on the night in question for which he could have been arrested. The City contends that but for the officers' exercise of their discretion not to file any charge against Karins, he might have been arrested for harassment pursuant to *N.J.S.A.* 2C:33–4 and for driving while under the influence of alcohol (DWI) pursuant to *N.J.S.A.* 39:4–50.

*N.J.S.A.* 2C:33–4 provides:

if, with purpose to harass another, he:

(a) Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

[*Id.*]

In *Hoffman,* we held that *"N.J.S.A.* 2C:33–4(a) should generally be interpreted to apply to modes of communicative harassment that intrude into an individual's 'legitimate expectation of privacy.' " *State v. Hoffman, supra,* 149 *N.J.* at 583, 695 *A.*2d 236. We held further that because subsection (a) was aimed at the manner of communication and not the content of the speech, "in enforcing subsection (a) ..., [the court] must focus on the mode of speech employed," and the determination must be made based on the totality of the circumstances. *Id.* at 583, 585, 695 *A.*2d 236.

In this instance, Karins's slur does not appear to have been made in an attempt to annoy or harass Officer Rassmann. Also, the statement was not made in a confrontational environment or in a manner intended to cause a breach of the peace. Although the racial epithet used by Karins was extremely offensive, the record does not provide a basis to conclude that his intention was to harass Officer Rassmann.

In dismissing the charge that Karins could have been arrested for DWI, the ALJ found that "[t]here was insufficient evidence that he was in violation of the drinking driving statute according

to Pronovost who saw no erratic driving and did not administer any test." That conclusory statement misses the point and is not entitled to any deference.

Karins was charged with conduct unbecoming a City firefighter based on the violation of any law, or doing "anything for which [he] may be arrested." *A.C.F.D.* Art. VII, § 2–A(c). A distinction must be drawn between: (1) whether there was probable cause to arrest for an offense, and (2) if arrested, whether the evidence was sufficient to establish guilt beyond a reasonable doubt. The significant distinction between the two is the quantum of proofs required. Although the fact finder in a quasi-criminal trial may or may not have been convinced beyond a reasonable doubt of Karins's guilt on a DWI charge, a showing of probable cause to arrest for DWI only required proof by a fair preponderance of the evidence. *N.J.S.A.* 39:4–50.4a; *United States v. Matlock,* 415 *U.S.* 164, 178 n. 14, 94 *S.Ct.* 988, 996 n. 14, 39 *L.Ed.*2d 242, 253 n. 14 (1974); *State v. Slockbower,* 79 *N.J.* 1, 16 n. 1, 397 *A.*2d 1050 (1979) (Schreiber, J., concurring); *State v. Whittington,* 142 *N.J.Super.* 45, 50–51, 359 *A.*2d 881 (App.Div.1976).

Here, there was a substantial basis to support a finding that probable cause existed to believe that Karins had been driving his vehicle while under the influence. *State v. Novembrino,* 105 *N.J.* 95, 119–22, 519 *A.*2d 820 (1987). Pronovost observed Karins driving his motor vehicle after Karins spoke with a parking attendant at the Harborfest festival. The officer then spoke to the same attendant who informed him that Karins appeared intoxicated. Based on that information, Pronovost made an investigatory stop of Karins's vehicle. Karins exited the vehicle and immediately identified himself as a City firefighter. While conversing with Karins, Pronovost observed that Karins staggered, slurred his speech, and smelled of alcohol. In the exercise of his discretion, Pronovost did not conduct a field sobriety test and did not charge Karins with DWI, but that does not mean that he lacked probable cause to do so. Furthermore, a timely breathalyzer test showing a .10% blood-alcohol level would have established

guilt regardless of whether Karins passed or failed a sobriety test conducted at the scene. *State v. Tischio,* 107 *N.J.* 504, 510, 527 *A.*2d 388 (1987).

We conclude, therefore, that the City established by a preponderance of the evidence that Karins violated *A.C.F.D.* Art. VII, § 2–(A)(c) because probable cause existed to arrest him for DWI.

## VIII

Finally, Karins was charged with violating Operational Procedure # 105, which provides that it is a violation of A.C.F.D. policy to use "pejorative slurs to refer to a person's racial or ethnic background with the purpose or effect of harassing an employee or creating a hostile work environment." The ALJ concluded that the policy did not apply to Karins's conduct. We disagree.

The ALJ's decision ignores the fundamental policy behind Operational Procedure # 105, and the reasons for its enactment. The preamble to Operational Procedure # 105 states the City's policy with respect to discrimination in the workplace:

> The City's Discrimination Procedures Policy . . . contained in the Personnel Policy and Procedure Manual, expresses the commitment of the City to prohibit discrimination in the workplace, based on one or more of the following characteristics: race, religion, color. . . .
>
> \* \* \*
>
> Harassment of an employee based upon one or more of the above characteristics is a form of prohibited discrimination. The City's policy forbids maintenance of a hostile work environment against an employee based upon one or more of the characteristics mentioned above. The work environment must be free from conduct which assaults the dignity of an employee based upon any of these characteristics.
>
> [*Id.*]

Karins signed a receipt acknowledging that he had received a copy of Operational Procedure # 105 less than three months before the present episode. His conduct in 1992, for which he was disciplined, was actually a factor that sparked the promulgation of Operational Procedure # 105.

On the night in question, Karins knew that Officer Rassmann was acting in an official capacity. Karins himself informed the officers that he was a City firefighter. In so doing, Karins implicitly recognized the official working relationship between the two departments and the importance of that relationship. Under those circumstances, Karins's racial slur had the clear capacity to create racial tension between the police and fire departments, thereby threatening that working relationship. That potential tension was substantially enhanced once Karins's co-workers found out about the incident. Indeed, it exacerbated the level of tension that predated this episode.

Furthermore, a firefighter's work environment extends beyond the firehouse and into the community both during emergencies and otherwise. During emergencies, the police are present whenever the fire department responds. During non-emergencies, both departments engage in community relations to alert the community about safety and to instill public confidence in the departments. The City has a compelling interest in making sure that racial tensions do not impede the duty of firefighters and police officers to work together. Karins received a copy of Operational Procedure # 105 and, therefore, was on notice that such conduct would not be tolerated. Thus, we conclude that the racial epithet uttered by Karins is covered by Operational Procedure # 105.

## IX

Although the present case has some elements of a hostile work environment case similar to *Taylor v. Metzger*, 152 *N.J.* 490, 706 *A.*2d 685 (1998) (holding that single derogatory racial comment can create hostile work environment by violating Law Against Discrimination), it is also different. Many hostile work environment cases require actual disruption of work or impaired performance. The absence of such evidence in this type of case is not critical. In a disciplinary case such as this one, it is not necessary "for an employer to allow events to unfold to the extent

that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick, supra,* 461 *U.S.* at 152, 103 *S.Ct.* at 1692, 75 *L.Ed.*2d at 723.

Conduct that weakens the public's trust tends to destroy the public's confidence in a fire department. Firefighters can perform their duties well only if they merit the trust and confidence of the community they serve. Public trust and confidence are essential to the department's effective and satisfactory operation. The Chief of a fire department has the responsibility of sedulously maintaining the departmental morale and discipline. The promotion of safety of persons and property is at the core of the mission of a fire department. That cannot be achieved without intra- and inter-departmental morale.

Clearly, Karins engaged in hate conduct that involved speech. There are certain words and phrases "that in the context of history carry a clear message of ... hatred, persecution, and degradation of certain groups." *State v. Vawter,* 136 *N.J.* 56, 66, 642 *A.*2d 349 (1994) (quoting from Mari J. Matsuda, *Public Response to Racist Speech: Considering The Victim's Story,* 87 *Mich.L.Rev.* 2320, 2365 (1989)). Karins's conduct falls squarely within that category. Hate conduct or speech "harms the individual who is the target[;] ... it perpetuates negative stereotypes [and] promotes discrimination ... by creating an atmosphere of fear, intimidation, harassment, and discrimination." Laura J. Lederer & Richard Delgado, *The Price We Pay* 4-5 (1995).

Conduct subversive of discipline and morale not only violates the department's rules and regulations, but it warrants serious discipline especially for repeat offenders. Karins, having been previously suspended without pay for similar conduct, should not be surprised to receive more severe discipline the second time. The imposition of progressive discipline will not have a chilling effect on public employees' right to engage in appropriately protected speech. In the disciplinary context, the First Amendment does not provide a retreat for purveyors of racist speech in the work environment who do not satisfy the *Pickering/Connick* stan-

dard. Racist speech or conduct, such as that involved in this case, is not purely private when made in connection with the performance of public service. Under those circumstances, a public employee is not immune from disciplinary proceedings. *Connick, supra,* 461 *U.S.* at 147, 103 *S.Ct.* at 1687, 75 *L.Ed.*2d at 720. Accordingly, we reverse the judgment of the Appellate Division that resulted in a dismissal of all charges against Karins. We affirm the decision of the Personnel Director of Atlantic City and reinstate Karins's suspension for forty-eight days without pay.

Reversed.

*For reversal*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.