746 A.2d 499

GREEN TOWNSHIP EDUCATION ASSOCIATION, PLAINTIFF–APPELLANT, v. STEPHEN P. ROWE, DAVID BRADY, RONALD PARKS, MARK GRAHAM, MELINDA MCCOY MILLER, JOHN MCDERMOTT, DOREEN SCHAFFER, DENISE SHEEHAN, AMY STEWART, KEN SWISHER AND GREEN TOWNSHIP BOARD OF EDUCATION, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted February 2, 2000—Decided February 28, 2000.

526

Before Judges BAIME, EICHEN and WECKER.

*Balk, Oxfeld, Mandell & Cohen*, attorneys for appellant (*Nancy I. Oxfeld*, of counsel and on the brief).

*Methfessel & Werbel*, attorneys for respondents (*Eric L. Harrison* and *Jeffrey M. Patti*, on the brief).

*Cynthia J. Jahn*, Director, Legal Department, New Jersey School Boards Association, attorney for amicus curiae New Jersey School Boards Association (*Krystal A. Wilson*, on the brief).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Zazzali, Zazzali, Fagella & Nowak,* attorneys for amicus curiae New Jersey Education Association (*Richard A. Friedman,* of counsel and on the brief; *Aileen M. O'Driscoll,* on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D

This appeal presents novel questions concerning the extent to which a governmental employer may restrict its employees' freedom of speech in the setting of the workplace. At issue is whether the Green Township Board of Education's conflict of interest policy barring teachers from engaging in specified political activities infringes upon the right of free speech. An ancillary question is whether the Board may bar teachers from wearing a political button bearing the inscription "NJEA SETTLE NOW" while in the school premises in the presence of students. The Green Township Education Association sought a declaratory judgment and an injunction prohibiting the Board from enforcing its policy. The Chancery Division granted the Board's motion for summary judgment. The Association appeals. We affirm in part and reverse in part. We conclude that parts of the Board's conflict of interest protocol substantially restrict constitutionally protected conduct and are thus unenforceable. However, we perceive no constitutional impediment to enforcement of the Board's prohibition against the display of political buttons in the context of this case.

## I.

The Association is the certified collective negotiations representative for all teachers, librarians, nurses, and teaching assistants employed by the Green Township School District. Stephen Rowe is the superintendent of schools. The remaining defendants are members of the Board of Education. The school district consists of a single elementary school with grades from kindergarten to eighth grade. The school is housed in a single building.

In 1995, the Board adopted a conflict of interest policy that provided in pertinent part as follows:

All employees are prohibited from active campaigning on school property on behalf of any candidate for local, state or national office or actively promoting any opinions on voting issues.

All employees working in a facility of this district which is used as a polling place are prohibited on an officially declared election day from displaying any materials that would promote the election of any candidate or opinions on voting issues.

All employees are prohibited from engaging in any activity with students during performance of the employees' duties, which activity is intended or designed to promote, further or assert a position on any voting issue, board issue, or collective bargaining issue.

Disciplinary Action

Violations of this policy may result in disciplinary action.

The Board's protocol apparently attracted little attention until the Association's collective bargaining agreement expired. At that juncture, teachers began displaying buttons reading "NJEA SET-TLE NOW" while in the presence of students in the school building. Citing the conflict of interest policy, Rowe directed the Association's members to refrain from wearing the buttons in the presence of students while on school premises.

The Association then commenced this action. In their documentary submissions, the parties presented markedly different accounts of the history leading up to the Board's promulgation of its conflict of interest policy. It was undisputed that the Association's members had displayed similar buttons while in the presence of students in the course of an acrimonious labor dispute in 1992. Although the Board contended that the display of the buttons had resulted in classroom disruptions, this allegation was hotly contested by the Association.

The Association argued in the Chancery Division that the conflict of interest policy suffered from "overbreadth." Noting that the prohibition against "active campaigning on school property" could be construed as precluding teachers from voicing their opinions at regularly scheduled Board meetings conducted in the school building and prohibiting them from engaging in political discussion in the teachers' lunchroom out of the presence of

students, the Association asserted that the policy stifled its members' right to engage in free speech. The Association similarly argued that the prohibition against displaying or exhibiting campaign materials was not confined to the school building and could be interpreted as preventing the dissemination of political leaflets from the teachers' homes or elsewhere. The Association further contended that the First Amendment guaranteed the right of its members to display "NJEA SETTLE NOW" buttons because the inscription pertained to an issue of public concern. The Board responded that the Association's interpretation of the conflict of interest protocol was hypertechnical and literal, and that the policy was not intended to prevent teachers from promoting their political views except in the school building while in the presence of students. The Board further argued that the display of political buttons in the classroom did not constitute constitutionally protected activity.

The Chancery Division found no merit in the Association's arguments. In reaching this conclusion, the court emphasized that the Board's interest in achieving its educational objectives outweighed the teachers' First Amendment right to comment on matters of public concern. Although the conflict of interest protocol does not confine the prohibition against active campaigning to situations in which students are present, the court found no intent on the part of the Board to extend the policy to settings other than the classroom. In a similar vein, although the protocol does not expressly limit its ban on the display of political materials to the school premises, the court determined that such limitation was implied in the language employed. With respect to the "NJEA SETTLE NOW" buttons, the court agreed with the Association's argument that they pertained to an issue of public concern. However, the Board's duty to provide "a thorough and efficient education to the town's youth" was said to override the teachers' interest in expressing their view. The Court reasoned, "[a]s innocuous as the buttons may seem, their message is a political grievance, and there is no useful purpose in subjecting whole classrooms of children, who are a captive audience for most

of the day and who cannot vote, to that message." Judgment was entered accordingly.

## II.

The overbreadth doctrine "involves substantive due process considerations concerning excessive governmental intrusion into [constitutionally] protected areas." *Karins v. City of Atlantic City*, 152 *N.J.* 532, 544, 706 *A.*2d 706 (1998) (quoting *Petition of Soto*, 236 *N.J.Super.* 303, 324, 565 *A.*2d 1088 (App.Div.1989), *certif. denied*, 121 *N.J.* 608, 583 *A.*2d 310, *cert. denied*, 496 *U.S.* 937, 110 *S.Ct.* 3216, 110 *L.Ed.*2d 664 (1990)). "The standard is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far in fulfilling the State's interest." *Ibid.; see also State v. Cardell*, 318 *N.J.Super.* 175, 182, 723 *A.*2d 111 (App.Div.), *certif. denied*, 158 *N.J.* 687, 731 *A.*2d 46 (1999). So posited, the issue is whether the prohibitions contained in the protocol embrace subjects beyond their proper reach.

Before we address that question, we note a procedural problem that has not been raised by the parties. We abhor deciding questions in advance of constitutional necessity. This principle rests on more than the fussiness of judges. It is based instead on our recognition of the limits of judicial power. We have no roving commission to seek and destroy constitutional error. Facial invalidation of a statute, regulation or governmental proto-col "is, manifestly, strong medicine" that "has been employed ... sparingly and only as a last resort." *Binkowski v. State*, 322 *N.J.Super.* 359, 375, 731 *A.*2d 64 (App.Div.1999) (quoting *Broadrick v. Oklahoma*, 413 *U.S.* 601, 613, 93 *S.Ct.* 2908, 2916–17, 37 *L.Ed.*2d 830, 841–42 (1973)); *see also FW/PBS, Inc. v. Dallas*, 493 *U.S.* 215, 223, 110 *S.Ct.* 596, 603, 107 *L.Ed.*2d 603, 616–17 (1990). Deeply embedded in our jurisprudence is the concept that "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situa-

tions not before the court." *Broadrick v. Oklahoma,* 413 *U.S.* at 610, 93 *S.Ct.* at 2915, 37 *L.Ed.*2d at 839.

An exception to that general principle has been carved out in the area of First Amendment rights. Free speech needs breathing space. Constitutionally protected speech may be muted and perceived grievances left to fester by the very existence of a statute or governmental policy. *Id.* at 612, 93 *S.Ct.* at 2916, 37 *L.Ed.*2d at 840. Even if moribund, an overly broad statute may chill or stifle constitutionally protected speech. And if the statute is not applied or enforced, the courts are none the wiser and the right of expression is nonetheless impaired. *Ibid.* Claims of facial overbreadth have thus been entertained in cases involving statutes which, by their terms, seek to regulate "only spoken works," *Gooding v. Wilson,* 405 *U.S.* 518, 520, 92 *S.Ct.* 1103, 1105, 31 *L.Ed.*2d 408, 413 (1972) (statute criminalizing "opprobrious words or abusive language"); *Cohen v. California,* 403 *U.S.* 15, 17, 91 *S.Ct.* 1780, 1784, 29 *L.Ed.*2d 284, 288 (1971) (statute criminalizing "behavior which has a tendency to provoke others to acts of violence or to in turn disturb the peace"); *Brandenburg v. Ohio,* 395 *U.S.* 444, 445, 89 *S.Ct.* 1827, 1829, 23 *L.Ed.*2d 430, 432 (1969) (criminalizing "advocating ... crime, sabotage, violence or unlawful methods of terrorism"). Similar treatment has been given to statutes which, by their broad sweep, might result in burdening innocent associations. *United States v. Robel,* 389 *U.S.* 258, 260, 88 *S.Ct.* 419, 422, 19 *L.Ed.*2d 508, 512 (1967) (barring employment of registered communists in the defense industry); *Aptheker v. Secretary of State,* 378 *U.S.* 500, 514, 84 *S.Ct.* 1659, 1668, 12 *L.Ed.*2d 992, 1002 (1964) (challenge to Subversive Activities Control Act). Claims of facial overbreadth have also been permitted in cases in which statutes, by their terms, purport to regulate the time, place and manner of expressive or communicative conduct, *Cameron v. Johnson,* 390 *U.S.* 611, 617, 88 *S.Ct.* 1335, 1339, 20 *L.Ed.*2d 182, 188 (1968) (antipicketing law), and cases involving statutes requiring official approval of expressive or communicative acts, *Shuttlesworth v. City of Birmingham, Ala.,* 394 *U.S.* 147,

150–51, 89 *S.Ct.* 935, 938, 22 *L.Ed.*2d 162, 166 (1969) (ordinance requiring parade permit).

The United States Supreme Court has said "[i]t remains a 'matter of no little difficulty' to determine when a law may properly be held void on its face and when 'such summary action' is inappropriate." *Broadrick v. Oklahoma*, 413 *U.S.* at 615, 93 *S.Ct.* at 2917, 37 *L.Ed.*2d at 842 (quoting *Coates v. City of Cincinnati*, 402 *U.S.* 611, 617, 91 *S.Ct.* 1686, 1689, 29 *L.Ed.*2d 214, 219 (1971) (separate opinion of Black, J.)). But the plain import of the cases we have cited is that, "at the very least, . . . facial overbreadth adjudication is an exception to our traditional rules of practice. . . ." *Ibid.* The Court has emphasized that "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to [its] plainly legitimate sweep." *Ibid.* Stated somewhat differently, "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." [1] *Id.* at 613, 93 *S.Ct.* at 2916, 37 *L.Ed.*2d at 841.

---

[1] Recent federal decisions have, to some extent, blurred the distinction between facial and as-applied constitutional challenges. In *United States v. National Treasury Employees Union*, 513 *U.S.* 454, 115 *S.Ct.* 1003, 130 *L.Ed.*2d 964 (1995), the Court invalidated a section of the Ethics in Government Act of 1978 that prohibited members of Congress, federal officers and other governmental employees from accepting honoraria for making a speech or writing an article. Noting that the ban on honoraria "affect[ed] hundreds of thousands of federal employees," *id.* at 471, 115 *S.Ct.* at 1015, 130 *L.Ed.*2d at 982, the Court required the Government to "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression [were] outweighed by [the] expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468, 115 *S.Ct.* at 1014, 130 *L.Ed.*2d at 980–81. In *Harman v. City of New York*, 140 *F.*3d 111, 118 (2d Cir.1998), and *Sanjour v. Environmental Protection Agency*, 56 *F.*3d 85, 92 (D.C.Cir.1995), the Second Circuit and the District of Columbia Circuit read the Supreme Court's decision as rendering unimportant the distinction between facial and as-applied constitutional challenges in that setting. *See also Davis v. New Jersey Dept. of Law*, 327 *N.J.Super.* 59, 71 n. 7, 742 *A.*2d 619 (Law Div.1999).

We have no occasion to consider that question here. None of these decisions implicated the test for facial overbreadth set forth in *Broadrick*.

Within this analytical framework, the question is whether the Board's conflict of interest policy or its prohibition against displaying the Association's "NJEA SETTLE NOW" buttons imposes a "real" and "substantial" burden on constitutionally protected conduct. This is a free country. Every American has the right to express an opinion on issues of public significance. *Waters v. Churchill*, 511 *U.S.* 661, 694, 114 *S.Ct.* 1878, 1898, 128 *L.Ed.*2d 686, 712 (1994) (Stevens, J., dissenting). Teachers are not relegated to "a watered-down version" of constitutional rights. *Karins v. City of Atlantic City*, 152 *N.J.* at 548, 706 *A.*2d 706 (quoting *Hasenstab v. Board of Fire & Police Commissioners*, 71 *Ill.App.*3d 244, 249, 27 *Ill.Dec.* 524, 527, 389 *N.E.*2d 588, 591 (1979)). Nevertheless, the right of free speech is not a license to express one's opinions "at any public place and at any time." *Hurwitz v. Boyle*, 117 *N.J.Super.* 196, 201, 284 *A.*2d 190 (App.Div. 1971). Moreover, the government as employer has far broader powers in regulating speech than does the government as sovereign. *Waters v. Churchill*, 511 *U.S.* at 671, 114 *S.Ct.* at 1886, 128 *L.Ed.*2d at 697 (citing *Connick v. Myers*, 461 *U.S.* 138, 147, 103 *S.Ct.* 1684, 1689, 75 *L.Ed.*2d 708, 720 (1983); *Civil Serv. Com'n v. Nat. Ass'n of Letter Carriers*, 413 *U.S.* 548, 564, 93 *S.Ct.* 2880, 2890, 37 *L.Ed.*2d 796, 808 (1973); *Pickering v. Board of Educ.*, 391 *U.S.* 563, 568, 88 *S.Ct.* 1731, 1735, 20 *L.Ed.*2d 811, 817 (1968)). Constitutional review of government employment decisions thus rests on different principles than review of speech restraints imposed by the government as they apply to the general citizenry. *Id.* at 674, 114 *S.Ct.* at 1888, 128 *L.Ed.*2d at 697.

In *Pickering v. Board of Educ.*, 391 *U.S.* 563, 88 *S.Ct.* 1731, 20 *L.Ed.*2d 811, the United States Supreme Court considered whether a public school teacher could be disciplined for writing a letter

---

They merely hold that in balancing the right of public employees to free speech against the interest of government in performing its obligations expeditiously and efficiently, a court must consider the impact of the governmental restraint on factors that "go beyond the facts of the case before it." *Davis v. New Jersey Dept. of Law*, 327 *N.J.Super.* at 71 n. 7, 742 *A.*2d 619. We adopt that approach and apply it in the sections that follow.

to a local newspaper, criticizing the board of education and superintendent of schools for failing to raise adequate revenue. The Court reasoned that a balance had to be struck between the interests of employee as citizen in commenting upon matters of public concern and those of the State, as employer, in promoting legitimate governmental objectives. *Id.* at 568, 88 *S.Ct.* at 1734–35, 20 *L.Ed.*2d at 817. In formulating a test to achieve this balance, the Court stated that if "the fact of employment is only tangentially and insubstantially involved in the subject matter of the [employee's communication], it is necessary to regard the [employee] as the member of the general public he seeks to be." *Id.* at 573–74, 88 *S.Ct.* at 1737–38, 20 *L.Ed.*2d at 820–21. In that event, the employee's right to free speech is considered paramount. The Court acknowledged, however, that government may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large. *Ibid.* In such a case, the duty of government to achieve its mission in an efficient manner may serve to trump the employee's freedom of expression. *Ibid.* Recognizing that the letter authored by the teacher did not impede the proper performance of his duties in the classroom, the Court concluded that the school administration's interest "in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 572–73, 88 *S.Ct. at* 1737, 20 *L.Ed.*2d at 819–20. The Court thus concluded that the disciplinary action taken against the teacher was unconstitutional.

### A.

Although the balancing test adopted in *Pickering* can be articulated with disarming ease, its application to the specific facts of the case is not without difficulty. We first consider the conflict of interest protocol.

The threshold question is whether the employee's speech that is prohibited may be "fairly characterized as constituting

[expression] on a matter of public concern." *Connick v. Myers,* 461 *U.S.* at 146, 103 *S.Ct.* at 1690, 75 *L.Ed.*2d at 719. Although educational policy and labor relations are undoubtedly subjects of public concern, teachers obviously have a personal stake as well in seeking solutions and resolving problems in these areas. Whatever interest teachers have in expressing their views concerning the operation of the public schools is surely diminished in the setting of the classroom in the presence of students. The objective of the teacher in this context must be to educate his or her students and not to advance his or her self-interest. Conversely, the Board of Education has no interest in barring teachers from expressing their views on educational policy. "But where government is employing someone for the purpose of effectively achieving its goals," *Waters v. Churchill,* 511 *U.S.* at 675, 114 *S.Ct.* at 1888, 128 *L.Ed.*2d at 699, it has an interest in restricting its employee's speech in order to accomplish that objective.

■ The problem with the Board's protocol is that its prohibitions are not invariably confined to the setting of the school facility or classroom. Nor are its restraints and prohibitions always limited to situations in which students are present. As written, the first clause prohibits (1) "[a]ll employees" from (a) "active campaigning," or (b) "actively promoting any opinions on voting issues," (3) on school property. The prohibition against "active campaigning" applies to employee conduct outside the presence of students. Read literally, the clause bars employees from using their lunch breaks or free periods to express their opinions to other willing adults even if no students are present. Read literally, the clause precludes teachers from speaking at board of education meetings conducted at the school facility. In a similar vein, the Board's prohibition against displaying campaign materials is not limited to school property. Instead, this clause prohibits (1) "[a]ll employees ... working in a facility of [the] district" (2) "which is used as a polling place," from (3) "displaying any materials that would promote" (a) "the election of any candidate", or (b) "opinions on voting issues," (4) "on an officially declared

election day." As interpreted by the Association, it prohibits teachers from passing out political leaflets off school property during non-working hours. It is susceptible to a construction that its reach is everywhere, and encompasses the most benign activities. The third clause, barring teachers in the presence of students, from "promot[ing] ... a position on any ... collective bargaining issue," does not suffer from these infirmities.

We have no doubt but that a carefully worded protocol tailored to prohibiting teachers from promoting positions on labor relations issues in the presence of students while on school property could pass constitutional muster. *See Tinker v. Des Moines Indep. Community School District,* 393 *U.S.* 503, 89 *S.Ct.* 733, 21 *L.Ed.*2d 731 (1969). So too, there would be no constitutional impediment to a protocol barring teachers from displaying campaign materials while on school property that is being used as a polling place on the day of an election. We agree with the Chancery Division that some of the Association's interpretations of the protocol can fairly be characterized as strained. We also acknowledge the Board's assertion that it would not apply or enforce the protocol in situations not involving the presence of students. We have thus considered whether we should redraft the protocol so as to render it constitutional. *See State v. DeSantis,* 65 *N.J.* 462, 472–73, 323 *A.*2d 489 (1974); *Camarco v. City of Orange,* 61 *N.J.* 463, 466, 295 *A.*2d 353 (1972); *see also Karins v. City of Atlantic City,* 152 *N.J.* at 546, 706 *A.*2d 706; *State v. Mortimer,* 135 *N.J.* 517, 533–34, 641 *A.*2d 257, *cert. denied,* 513 *U.S.* 970, 115 *S.Ct.* 440, 130 *L.Ed.*2d 351 (1994); *State v. Afanador,* 134 *N.J.* 162, 170, 631 *A.*2d 946 (1993); *State v. Ramseur,* 106 *N.J.* 123, 200, 524 *A.*2d 188 (1987); *State v. Zito,* 54 *N.J.* 206, 218, 254 *A.*2d 769 (1969); *State v. Profaci,* 56 *N.J.* 346, 349–50, 266 *A.*2d 579 (1970). However, the Board has not requested us to perform judicial surgery, and we perceive no pressing need to do so. The constitutional problems we have identified can be easily fixed by the Board. While imaginative attorneys might perhaps be able to conjure up hypotheticals in which a redrafted protocol would infringe upon First Amendment rights, such attacks can best be considered on a case-by-case

basis.  We thus find unconstitutional the first two clauses of the Board's protocol.  We leave it to the Board to respond to the questions whether and how the protocol should be redrafted.

### B.

We consider separately the Board's prohibition against wearing the Association's "NJEA SETTLE NOW" buttons in the presence of students while on school premises.  We are satisfied that the Board's directive does not suffer from overbreadth.

The first rule of teaching should be that teachers shall teach.  A classroom is not a place for proselytizing students to advance a teacher's financial interests.  Nor should a classroom be transmogrified into a teacher's soapbox.  *River Dell Educ. Association v. River Dell Board of Educ.*, 122 *N.J.Super.* 350, 357, 300 *A.*2d 361 (Law Div.1973).  Just as a board of education may set the curriculum, it may also require teachers to confine their classroom activities to providing students with a thorough and efficient education.

We previously noted that government has greater power to regulate speech when it acts as employer than when it acts in relation to the general citizenry.  This assumption is amply borne out by the practical realities of the workplace.  The extra power the government has in this area stems from the nature of the government's mission as employer.  *Waters v. Churchill,* 511 *U.S.* at 671–72, 114 *S.Ct.* at 1886–87, 128 *L.Ed.*2d at 699.  All rights belong to the individual.  The government has none—it has only duties, and powers with which to discharge them.  Government is thus charged by law with performing particular tasks.  Employees are hired to help do these tasks as effectively and efficiently as possible.  In terms of the First Amendment, government's interest in achieving its goals is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.  *Ibid.* Government cannot restrict the speech of the citizen just in the name of efficiency.  But where government is

employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate. Thus, in the context of the dispute before us, teachers have a job to do. Although wearing "NJEA SETTLE NOW" buttons may appear to be innocuous, the Board could reasonably have concluded that such displays carry a risk of interfering with the performance of this job.

Our decision fosters, rather than retards, academic freedom. "Openness is not to be condemned." *River Dell Educ. Assn. v. River Dell Bd. of Educ.*, 122 *N.J.Super.* at 357, 300 *A.2d* 361. But teachers serve as authority figures, and students are their captive audience. A classroom is not a free market of ideas. There is often no counterpoint to the views expressed by the teacher. Against this backdrop, we see nothing amiss in the Board's insistence that teachers confine their classroom activities to promoting the education of their students. This does not require teachers to refrain from responding to questions propounded by students. *Ibid.* Nor does it preclude teachers from discussing the topic of education in a bona fide manner consistent with their role as educators. Nor does the prohibition bar teachers from wearing buttons in other settings not involving the presence of students. In short, we perceive no violation of the teachers' First Amendment freedom.

Affirmed in part and reversed in part. The matter is remanded to the Chancery Division for modification of the judgment.